**SKEELS v. UNITED STATES.**

**Civ. A. No. 2031.**

District Court, W. D. Louisiana, Shreveport Division.

July 7, 1947.

Booth, Lockard & Jack and Whitfield Jack, all of Shreveport, for plaintiff.

Malcolm E. Lafargue, U. S. Atty., and Wm. J. Fleniken, Asst. U. S. Atty., both of Shreveport, for defendant.

DAWKINS, District Judge.

This is a suit by the administrator of the estate of Jasper D. Skeels for the use and benefit of his widow, Mrs. Gladys Skeels Uthoff, and his mother, Mrs. Zell Ann Wilie Skeels, under the Federal Tort Claims Act of 1946, Tit. IV, sec. 402 et seq., Pub.Law No. 601, 79th Congress, Chapter 753, Second Session., 28 U.S.C.A. § 921 et seq.

The pertinent articles of the complaint are as follows:

"At about 11:40 o'clock A.M. on the morning of July 24, 1945, Jasper Gillie Skeels and several other persons were in a boat, fishing, in the Gulf of Mexico, about six miles out from the shoreline of Freeport, Texas. High overhead, several airplanes, property of the government of the United States, then and there operated by and under the physical control of agents and employees of the government of the United States, to-wit: personnel of the United States Army. Some of the airplanes were towing targets. Some of the airplanes were firing guns. A piece of iron pipe 14 inches long and 1½ inches in diameter, fell either from said airplanes or said targets, striking Jasper Gillie Skeels on the head and immediately killing him.

"The doctrine of res ipsa loquitur applies, and petitioner especially pleads same.

"Petitioner does not know what caused the heavy object to fall, and alleges that knowledge thereof is peculiarly within the possession of the defendant, its agents and employees.

"Petitioner alleges that the defendant, its agents and employees aforesaid, were guilty of negligence, which negligence was the direct and proximate cause of the injury to, and death of, Jasper Gillie Skeels, in the following particulars:

"(a) Engaging in, and permitting maneuvers and the firing of guns and the towing of aerial targets over a place that was not restricted to the public, to-wit: The place where decedent was killed.

"(b) In causing or permitting the iron pipe to become unfastened or separated from whatever it was attached to.

"(c) In causing or permitting the iron pipe to fall at the time, place and circumstances under which it did fall.

"(d) In throwing from said airplane or towed targets the said iron pipe, under the circumstances aforesaid."

Counsel for the Government have moved to dismiss the complaint for the reasons, as alleged, it disclosed no ground for relief because (1) it affirmatively shows that whatever injury was caused resulted from combat activities of the armed forces while the nation was at war; and (2) no negligence is shown.

(1) The law relied upon is a part of what was known as the LaFollette Legislative Reorganization Act of 1946, 60 Stat. 812. Its purpose was to relieve Congress of the duty of considering hundreds of bills introduced annually for the reimbursement of persons for torts committed by governmental agencies or agents. Section 410(a) confers upon the judges of the United States District Courts the duty to hear and determine without the aid of juries "any claim against the United States, for money only, * * * on account of damage to or loss of property or on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant for such damage, loss, injury, or death in accordance with the law of the place where the act or omission occurred.*" (Emphasis by the writer.)

Section 421, under the heading of Exceptions declares that "The provisions of this title shall not apply to— * * * (j) any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war."

It is conceded and, of course, is a matter of common knowledge that the United States was still at war with Japan on July 24, 1945, at the time of the accident complained of, and the question for determination is as to whether the activity

alleged was "combatant" within the meaning and intention of the statute. The word "combatant" is defined as follows (Webster's Unabridged Dictionary, 2d Ed., printed in 1942): "Combatant–adj., contending or disposed to contend; (a) Military–taking part in or prepared to take part in active fighting, as a combatant officer as distinguished from one of the medical commissariat or a similar branch."

New Century Dictionary, Volume 1 (1936 Ed.): "Combatant–I.a. Combating; fighting; also, disposed to combat or contend; in heraldry, rampant as if in combat, as two lions, etc., facing each other; II.n. One who takes part in combat or fighting, or in any conflict."

■ If it had been intended that all activities of the armed forces in furtherance or preparation for war were to be included, the use of the words "war activities", it seems, would have been more appropriate, but instead, the exception or exemption from liability for torts was restricted to "combat activities", which as indicated by the definitions, means the actual engaging in the exercise of physical force. It is fair to assume that the allegations of this complaint are meant to charge that the army was engaged in practice or training for combat rather than combat duties. To hold that mere practice or training activities, even in time of war, come within the exception, would be to relieve the Government from liability for collision of its vehicles with those of private persons upon the highway, the damage or destruction of property, timber, crops, etc., by the wilful or negligent acts of the armed forces, in whatever locality they might be stationed for training so long as the individual offender was performing some act connected with training or practice. We, of course, are aware that a large number of claims presented to the Congress and for which such acts were passed cover matters of this kind. It is believed that the phrase was used to denote actual conflict, such as where the planes and other instrumentalities were being used, not in practice and training, far removed from the zone of combat, but in bombing enemy occupied territory, forces or vessels, attacking or defending against enemy forces, etc. In practice or training remote from combat, there would be the same opportunity for care and caution as in peace time; whereas, in actual fighting, the attention and energies of the military personnel would be directed and devoted to the destruction of the enemy and its property, as well as to the protection of the lives of their own forces, citizens and property by the use of force immediately applied. In view of the very recent enactment of this measure no precedents have been found but the conclusions reached seem to agree with common sense and the ordinary meaning of the words.

■ Turning now to the second point, the complaint, in the allegations quoted above, says in effect that the army was engaged in target practice with its military planes some six miles out in the Gulf of Mexico. Plaintiff frankly states that he does not know what caused the piece of pipe to fall and strike the deceased. He alleges that the information in regard thereto is wholly within the knowledge of the defendant and resort is had to the doctrine of res ipsa loquitur. It is also charged that there was negligence in carrying on such activities without establishing a restricted area and giving proper notice to the public of its use for such purposes. In view of this allegation, which, while used in the negative sense, the effect is to say that ordinarily where such practice is carried on the precaution of confining it to a particular locality and warning the public to stay away from the area is followed. These allegations are somewhat vague, but until something is revealed as to the habits of the armed forces in regard to such matters, it is not felt that the Court can say as a matter of law that any part of the coastal waters can without warning be used for such purposes, merely because it is as much as six miles from shore. Those so engaged were bound to know that discharged shots or missles would fall to the water. It would seem, also, that if objects of the character which fell on the deceased were used in keeping taut a fragile target, those in control should have realized the possibility or perhaps probability that, if the firing was accurate and concentrated enough, such objects might be severed from the

towing plane and fall into the water. It is common knowledge that target practice by ground forces is restricted to certain specially selected and protected localities.

The motion to dismiss will be denied.

Proper decree should be presented.