**DYE v. UNITED STATES (two cases).**
**KING v. UNITED STATES.**
**Civ. A. 1998, 1999, 2054.**

United States District Court
W. D. Kentucky. Louisville.

Sept. 11, 1952.

E. J. Wells, S. A. Lynch, Louisville, Ky., for the plaintiffs.

D. A. Walls, U. S. Atty., Louisville, Ky., Charles F. Wood, Asst. U. S. Atty., Louisville, Ky., for the defendant.

SHELBOURNE, Chief Judge.

The three actions above numbered were tried together to the Court without a jury under the provisions of the Federal Tort Claims Act, Title 28 U.S.C.A. § 1346(b).

Each is brought by the widow, as Administratrix, to recover for the alleged wrongful death of Charles R. Dye in Action 1998, James Otto Dye in 1999 and Glenn G. King in Action No. 2054.

The actions, as originally filed, alleged that the decedent's death in each case, resulted from the action of the United States Coast Guard and the United States Corps of Engineers, in maintaining and operating Dam No. 41 in the Ohio River near Louisville, Kentucky, carelessly and negligently and permitting the wickets of the dam to be opened, thereby causing a strong and violent current without adequate warning to persons upon the river and without having made suitable provisions for their protection and that as a result the boats in which decedents were riding were pulled over the Dam, capsized and so injured the decedents that they immediately died.

The Court, on defendant's motions to dismiss, held that no claim against the defendant upon which relief could be granted was stated insofar as allegations charging negligence of the United States Coast Guard was concerned, but overruled the motion with respect to the negligence

alleged to have caused the accident on the part of the United States Corps of Engineers.

The answers of the Government denied the material allegations of the complaints and affirmatively alleged that plaintiff's decedent, in each case, by his own contributory negligence, precluded any recovery on the part of his estate.

The case was tried on November 27, 1951.

On the evidence, the Court makes the following—

### Findings of Fact

1. Dam No. 41 is located in the Ohio River in Jefferson County, Kentucky, and was constructed by the United States, under the supervision of its Corps of Engineers and completed in 1927.

The dam is an L-shape structure beginning at a point on the Indiana shore and running perpendicular across the river for approximately 1500 feet, at which point the dam turns and parallels the river westwardly for approximately 6500 feet to a hydroelectric plant, built and operated by the Louisville Gas & Electric Company, which extends from the westermost end of the dam to the Kentucky shore line. The locks through which the boats passed are located adjacent to the Kentucky shore.

2. That part of the dam paralleling the river is composed of boule weirs so constructed that the wickets can be raised or lowered to control the flow of water in the section of the river east of the dam. The portion of the dam beginning at the Indiana shore and extending perpendicularly to the river for 1500 feet has 860 near the center of the dam of Chanoine wickets. When the Boule weirs are opened, the water drops from the upper pool to the lower pool below the dam for a distance of 17 to 21 feet.

3. March 20, 1949, the dam was under the operation and control of the United States Corps of Engineers. The weather on that date was clear.

About three o'clock P.M., Charles R. Dye and James Otto Dye launched a small plywood boat equipped with an outboard motor and oars on the Ohio River at about the foot of Fourth Street. Glenn R. King had rented a small aluminum boat on the River at the foot of Indian Hills Trail east of the City of Louisville. The aluminum boat was equipped with an outboard motor and oars. King proceeded from a point on the river at the foot of Indian Hills Trail westwardly to the section of the river opposite Fourth Street where he was joined by the two Dyes.

4. There is no definite evidence from which it may reasonably be inferred that the decedents were familiar or unfamiliar with the existence and location of Dam No. 41. A short time prior to his death, James Otto Dye was a representative of the Judd Manufacturing Company and was endeavoring to sell the product of that company, consisting of plywood boats similar to the one he was using on the day in question.

5. The Pennsylvania bridge, a railroad bridge, sometimes known as the "Ohio Falls Bridge" extends from a point on the Indiana shore approximately 120 feet downstream westwardly from the Chanoine end of the dam and extends southwardly across the river, converging in Louisville at a point between Fourteenth and Fifteenth Streets.

6. There was a sign on the Pennsylvania bridge containing the following words "Danger—High Dam". The sign is six feet high, thirteen feet wide, containing letters four inches wide and eighteen inches high, which sign is shown to be visible for a distance of three thousand feet.

There was also a sign located at the pumping plant of the Louisville Water Company, approximately a mile west of where the decedent King launched his boat. This sign on the day in question read "1200 feet of dam down—Use Locks." The sign is eight feet, two inches high, and eight feet four inches wide.

7. As indicated by the sign at the Water Company plant, 1200 feet of the wickets on the dam had been lowered for approximately twenty-four hours prior to the accident.

About one and a half feet of the dam extended above the surface of the water and the dam was visible for a distance of approximately three thousand feet.

8. On the day in question, the three decedents, with their two boats apparently being held together, were seen drifting in the current. The outboard motors, with one of which each boat was equipped, were not in operation. The boats drifted under the Pennsylvania railroad bridge at a point approximately one thousand feet south of the Indiana shore and approximately twelve hundred feet east of the perpendicular section of the dam. The boats went through that part of the Boule Weirs in which the wickets were lowered. The decedents were all drowned as a result of the passing over the dam with the boats.

9. The Lockmaster at the dam No. 41, Peter B. English, convincingly testified that boats of the type and size used by the decedents could be operated with the use of oars within four hundred feet of the opening of the dam when twelve hundred feet of weirs were lowered and that experienced oarsmen could operate boats of the same type within two hundred feet of the opening of the dam without being endangered by the suction of the current through the wickets.

The witnesses Emil Johnson and Leonard Williams, employees of the United States Engineers, saw the boats in which the decedents were riding when they were approximately two hundred yards east of the Pennsylvania Railroad bridge and attempted by waving and hollering to warn the decedents, but their warnings, if observed, were apparently unheeded.

There is no evidence from which it could be known why the boats were being held together or why the motors on the boats were not in operation.

No other signs or warning except the signs on the Pennsylvania Railroad bridge and at the Louisville Water Company's pumping station warned of the presence of the dam or the danger incident to the operation of the dam.

Professor W. R. McIntosh, professor of Civil Engineering at the University of Louisville testified that several practical and feasible ways could be used to give notice of the dam and the dangers incident thereto,—to place a warning sign on a vehicular bridge across the river at about Second Street in Louisville, known as the Clark Memorial Bridge; to place warning signs on both ends of the weirs of the dam or place buoys upstream from the dam with flasher lights.

10. It was known by the Corps of Engineers that small craft operated in the area above and below the Pennsylvania bridge and that a number of small boats were so operating on the afternoon of March 20, 1949.

Approximately ten minutes elapsed from the time the decedents were first observed in the vicinity of the dam until their boats passed through the wickets. The Coast Guard was promptly notified of the accident and a rescue boat was dispatched; recovered the three bodies, both small boats and the outboard motor of the plywood boat. The motor on the King boat was never recovered.

11. James O. Dye was forty-seven years of age and had a life expectancy of twenty-three years. Charles Dye was fifty-four years of age and had a life expectancy of eighteen years. Glenn G. King was twenty-four years of age and had a life expectancy of forty-three years. He earned approximately $3,300 per year. Each of the decedents Dye earned approximately $4,500 per year.

Upon the foregoing facts, the Court makes the following—

Conclusions of Law

I. This Court has jurisdiction of the parties and the subject matter. Title 28, Section 1346, U.S.C.A. So much of that Section as is pertinent here is as follows—

"(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the District Court for the Territory of Alaska, the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the

scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

II. K.R.S. 411.130 provides that where death results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it or whose agent or servant caused it.

Plaintiffs contend that the Government, having placed Dam No. 41 in the river, created an unsafe condition and became charged with the duty of warning the public, who might use the river in the vicinity of the Dam, of the danger.

It is contended that this duty was accentuated by the fact that other lives had been imperiled by the conditions which cost the lives of the Dye Brothers and King.

Reliance is had upon the cases under the Federal Tort Claims Act, such as Skeels v. U. S., D.C., 72 F.Supp. 372; Claypool v. U. S., D.C., 98 F.Supp. 702; Brown v. U. S., D.C., 99 F.Supp. 685; White v. U. S., D.C., 97 F.Supp. 12; Brouse v. U. S., D.C., 83 F. Supp. 373 and Beasley v. U. S., D.C., 81 F. Supp. 518.

In the Skeels case, supra, a piece of iron pipe fell from an airplane, being operated in maneuvers by the United States and struck plaintiff's decedent, while he was fishing in the Gulf of Mexico, and instantly killed. In the Claypool case, the Government was operating a National Park in Wyoming. The plaintiff and his family paid a fee for the privilege of entering the park. Plaintiff was severely injured by a bear and the liability is hinged upon the danger of attack from the bear which was known to those operating the park, but entirely unknown to the plaintiff and his family.

In the Brown case, the Government operated a swimming pool, in which the plaintiff's decedent lost his life by reason of a strong suction in the drainage pipe of the pool, in which pipe the decedent's arm was sucked by the force of the drainage and he was held fast at the bottom of the pool until he drowned.

In the White case, supra, plaintiff was killed by a shell exploding at a place where plaintiff's decedent was employed to work and it was held that the Government's agents and employees had not exercised reasonable care to make the place safe for plaintiff to work.

In the Brouse case above, the airplane in which Brouse was riding collided with a plane operated by an employee of the Government and the liability hinged upon the negligence of the employee of the Government.

These cases may, in the opinion of the Court, be distinguished from the case at bar by the fact that it is nowhere denied in this case that Dam No. 41 was constructed skillfully under a valid authority of Congress and that the Federal Government has the authority to create obstructions of this character in the river for the purpose of improving navigation, provided the river is a navigable stream. The grant of authority to build the Dam is a valid exercise of statutory power to improve navigation. Arizona v. California, 283 U.S. 423, 452, 457, 51 S.Ct. 522, 75 L.Ed. 1154.

█ The Court, therefore, is of the opinion that (1) The defendant, through its Corps of Engineers was not negligent in failing to give the plaintiffs' decedents personal notice of the dangers incident to the operation of the Dam. (2) That there is no negligence on the part of any employee of the United States—that is its Corps of Engineers in charge of operating Dam No. 41 on the day in question resulting directly or proximately in the drowning of the decedents.

█ The Court is unable to say from the evidence in this case that the decedents were guilty of contributory negligence so as to preclude a recovery by their estates.

It would not be negligence per se to operate craft such as they were operating on the occasion in question with the motor power shut off, unless they knew of the danger from the undertow in close proximity to the Dam. Correspondingly, it

would not be negligence per se for them to drive their craft or to let it drift close to the Dam, unless they knew what the Dam was and realized what its effect was on the undertow in the river.

The Court concludes in this case that there is no proof of negligence on the part of any employee of the Government, which can be said to constitute the proximate cause of the deaths involved.

It is therefore concluded that the complaint in each case should be dismissed.

Judgment to that effect will be tendered by Counsel for defendant upon notice to plaintiffs' Counsel.