## DYE et al. v. UNITED STATES.
### No. 11815.

United States Court of Appeals
Sixth Circuit.
Feb. 8, 1954.

S. Arnold Lynch, Louisville, Ky. (Edgar J. Wells, Louisville, Ky., on the brief), for appellants.

T. S. L. Perlman, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Paul A. Sweeney, Washington, D. C., David C. Walls, Charles F. Wood, Louisville, Ky., on the brief), for appellee.

Before ALLEN, MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

In these court actions, consolidated for trial, the United States District Judge, after hearing the evidence and the arguments, dismissed the complaints in the three cases. The actions were brought under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), against the United States, by the administratrix of the decedent in each case. Recovery of damages was sought for the death of the three decedents allegedly caused by the wrongful acts and negligence of agencies of the United States. The respective complaints averred that the United States Coast Guard and the United States Corps of Engineers, acting through their agents, so carelessly and negligently permitted the wickets of Dam 41 on the Ohio River in the State of Kentucky to be open—without adequate warning to persons traveling upon the Ohio River and without suitable provisions for their protection—as to cause a strong and violent current, which capsized two small boats, pulled them over the dam, and threw the respective occupants of the boats into the water with such force and violence that, as a direct consequence, each was immediately drowned.

Upon the trial, it was stipulated that Dam 41 is owned by the United States; that the Corps of Engineers, an agency of the executive branch of the United States, is charged with the duty of maintaining and operating the dam; that on March 20, 1949 (the date of the fatal accident), 1200 feet of wickets in the dam were open; that on that date the drop of water from the upper pool to the lower pool was between 17 and 21 feet; that on such date, around four o'clock P. M., James O. Dye and Charles R. Dye were seated in a TrailR boat in the Ohio River and Glenn G. King was seated in an aluminum boat in the river; that the TrailR boat had a wood hull, 13' 5" x 4' 6" x 1' 5", and the aluminum boat measured 12' 5" x 4' 5" x 1' 4"; that the two boats went through an open wicket of Dam 41 on March 20, 1949, around four o'clock P. M., and that the three men were drowned in consequence of their boats going through the open wickets.

An important exhibit in the case is a map of the dam and the adjacent river area prepared by the Corps of Engineers. Without printing this exhibit, it is difficult to describe the physical situation portrayed by the map. In attempting to do so we shall advert largely to the findings of the District Court.

Dam 41 is an L-shaped structure, beginning at a point on the Indiana shore and running perpendicularly across the river approximately 1,500 feet, at which point the dam turns and parallels the river westwardly for around 6500 feet to a hydroelectric plant built and operated by Louisville Gas & Electric Company and extending from the extreme western end of the dam to the shore line of Kentucky. The locks through which boats pass are located adjacent to the Kentucky shore.

That part of the dam paralleling the river is composed of boule weir so constructed that the wickets can be raised or lowered to control the flow of water in the section of the river east of the dam. That portion of the dam beginning at the Indiana shore, which extends perpendicularly to the river for 1,500 feet, has 860 feet of wickets near the center of the dam. This section can be opened to permit navigation. The stem of the L is constructed of a two-hundred-foot section of fixed concrete weir at its end farthest east, where it joins the base, and from that point west is constructed of boule weir surmounted by movable wickets. These wickets, when opened, permit water to flow over the boule weir from the upper to the lower pool of the river—a drop of some seventeen to twenty-one feet.

The Pennsylvania Railroad Bridge extends from a point on the Indiana shore approximately 120 feet downstream westwardly from the end of the dam and southwardly across the river, converging at a point in Louisville, Kentucky, between Fourteenth and Fifteenth Streets. At the time of the accident,

there was attached to the Pennsylvania Railroad Bridge a sign, six feet high and thirteen feet wide, with letters thereon four inches wide and eighteen inches high spelling out the following words: "Danger—High Dam." Approximately a mile west of the point where the decedent King launched his boat there was located, according to the finding of the District Court, a sign at the pumping plant of the Louisville Water Company bearing the words, "1200 feet of dam down—Use Locks." This sign was eight feet, two inches, high, and eight feet, four inches, wide. The District Court found [107 F.Supp. 8], further, that "no other signs or warning except the signs on the Pennsylvania Railroad bridge and at the Louisville Water Company's pumping station warned of the presence of the dam or the danger incident to the operation of the dam."

Around three o'clock in the afternoon, the small plywood boat occupied by the Dyes was launched on the Ohio River near the foot of Fourth Street in Louisville. The boat was equipped with oars and an outboard motor. King had proceeded in a small aluminum boat, which he had rented, from a point on the river at the foot of Indian Hills Trail, westwardly to the section of the river opposite Fourth Street where, apparently, he met up with and joined the Dye brothers. As found by the District Court: "There is no definite evidence from which it may reasonably be inferred that the decedents were familiar or unfamiliar with the existence and location of Dam No. 41."

With their two boats being held together, the three decedents, as found by the District Court, were observed drifting in the current of the river. The outboard motors with which the boats were equipped were not in operation. The boats drifted under the Pennsylvania Railroad Bridge at a point some 1,000 feet south of the Indiana shore and about 1,200 feet east of the perpendicular section of the dam. The two boats went through that part of the boule weir in which the wickets were lowered. There was no evidence as to why the boats were being held together or why their motors were not in operation. The District Court found that it was well known by the Corps of Engineers that small craft operated in the area above and below the Pennsylvania Railroad Bridge and that numerous other small boats were so operating on the afternoon of the day of the fatal accident.

It was found further that the sign on the Pennsylvania Railroad Bridge was visible for a distance of 3,000 feet; that about one and one-half feet of the dam extended above the surface of the water; and that the dam was visible for a distance of approximately 3,000 feet.

Appellants insist that the evidence did not warrant the finding that the sign on the bridge was visible from a distance of 3,000 feet. They emphasize the fact that the court did not find the maximum distance at which the words on the sign could be read. Moreover, appellants assert that the wording on the sign at the Louisville Water Company branch read, not as stated by the court, but thus: "Feet Dam Down—1200—Locks." Appellants dispute the statement that there was any competent evidence to support the finding that the dam was visible for a distance of approximately 3,000 feet.

The District Judge was evidently much impressed with the testimony of the lock master at the dam. In number nine of the findings of fact, the court said: "The Lock Master at the Dam No. 41, Peter B. English, convincingly testified that boats of the type and size used by the decedents could be operated with the use of oars within four hundred feet of the opening of the dam when twelve hundred feet of weirs were lowered and that experienced oarsmen could operate boats of the same type within two hundred feet of the opening of the dam without being endangered by the suction of the current through the wickets." The testimony of the lock master strongly conflicted with that of Chief Low of the Coast Guard, who had been officer in charge of the Louisville station since

1945. He asserted that when 1,200 feet of the wickets are open an ordinary boat operator cannot get out of the set of the water in that area; and that within five hundred feet of the dam it would take a very experienced operator to accomplish the same feat. The Chief gave logical reasons for his conclusions.

The testimony of Charles Millholan was also at complete variance with that of the lock master. He had worked on the dam for many years and had lived within one mile of it for fifty-three years. He swore that with 1,200 feet of wickets open, boats should stay at least a half mile away from the dam, for under that condition the current has tremendous drawing power. Millholan, himself, had frequently used a rowboat in the area and was an expert oarsman. On the afternoon of the accident, Millholan was standing on the Pennsylvania Railroad Bridge and first saw the two boats when they were opposite Eighth Street. He said that they drifted down the river, side by side, and that the suction of the water created by the open wickets pulled the two boats over the dam in about ten minutes from the time he first saw them.

Emil Johnson, a watchman for the Corps of Engineers, was stationed with the fleet at the foot of Ninth Street. He first observed the two boats approximately 700 to 1,000 yards above the Pennsylvania Railroad Bridge some time after three-thirty o'clock P. M. One man was holding the two boats together and their motors were not operating. Johnson testified that he waved and "hollered" to the men in the boats that they had "better get out" of the dangerous water, but that the three men did not look around or in anywise indicate that they had heard him. He said that the two boats continued drifting down stream and that he followed them to the Pennsylvania Bridge; but that he could not see the boats after they went under the bridge. He could call neither the Coast Guard nor the lock master, for the reason that his station was not equipped with a telephone.

Leonard Williams, who was working with Johnson, testified that when he noticed the two boats he "hollered" once to the men in them, but that they did not turn around or indicate that they had heard him. A man in one boat was holding the two boats together as they drifted down stream.

Langdon, bridge tender for the Corps of Engineers at the Eighteenth Street Government Bridge, first noticed the two boats drifting five hundred feet below the Pennsylvania Railroad Bridge and about the same distance south of the dam. He immediately telephoned the lock master to notify him of the incident.

The Coast Guard station maintained a lookout whose duty it was to keep the river under observation. According to the Coast Guard log, the lookout reported at four o'clock P. M., that two boats were close to Dam 41. At that time the station also received a call from the lock master's office that two boats were in danger at the dam. A rescue party was dispatched, but too late. The two boats had already gone over the dam when the rescue party arrived there.

Robert D. Cole, who was on a maneuver boat at Dam 41 not far below the point where the boats went over the dam, reported for duty at 3:30 P. M. He knew that 1,200 feet of wickets were open at the time, *and had been instructed by the Corps of Engineers to keep a lookout upstream for boats approaching the dam when the wickets were opened, but did not look out over the river until four o'clock, P. M., when the lock master's office telephoned to know if he had observed two boats in distress.* He looked up and saw the two boats going over the dam. One man in the wood-hull boat was trying to start his motor and the man in the aluminum boat was holding on to the wood-hull boat. Cole testified that there were no signs at the dam or on the bridge, or in the general area, to indicate to people upstream whether the wickets were open or shut. Cole was plainly guilty of negligent failure to perform his delegated duties.

Chief Low had testified that the dam is perfectly safe when closed, but that the public never knows when it is open or closed. He stated that, before the accident, several men working in boats for the Corps of Engineers had lost their lives in consequence of the current created by open wickets.

W. R. McIntosh, Professor of Civil Engineering at the University of Louisville, was an important witness for the appellants. As an expert, he testified that when the wickets were closed the river current does not exceed one or two miles per hour in velocity, but that when 1,200 feet of wickets are open the velocity at a point 2,500 feet upstream from the dam is three or four miles an hour, increasing as the water approaches the dam until, within twenty feet thereof, the velocity is twenty miles an hour. He made several suggestions for reducing the danger of small boats being carried over the dam when the wickets are open. His suggestions were that warning signs should be placed on Clark Memorial Bridge, on the Pennsylvania Railroad Bridge, and on both ends of all fixed weir; that movable buoys be placed between 2,000 and 3,000 feet upstream from the dam; that the buoys be 300 feet apart with flashing red lights attached to them; and that a chain of closely-spaced floats should be anchored upstream. He pointed out that, at a point from 1,000 to 2,500 feet away from the dam, a person could not tell when the wickets were open by seeing merely the one sign on the Pennsylvania Railroad Bridge; that this one sign, reading simply "Danger, High Dam," did not constitute sufficient warning to the public when the wickets were open and as to the risk involved in approaching the dam under such dangerous conditions. He swore further that ordinary signs could not be read from a distance of 2,-500 feet. The District Court found, however, that the sign had been shown to be visible for a distance of 3,000 feet; but the court did not state specifically that it could be read at that distance.

The District Court found, further, and we think correctly, that, from the evidence in the case, it could not be said that the three decedents were guilty of contributory negligence such as should preclude recovery of damages by their respective personal representatives. In his conclusions of law, the judge said: "It would not be negligence per se to operate craft such as they were operating on the occasion in question with the motor power shut off, unless they knew of the danger from the undertow in close proximity to the Dam. Correspondingly, it would not be negligence per se for them to drive their craft or to let it drift close to the Dam, unless they knew what the Dam was and realized what its effect was on the undertow in the river." The Court concluded, however, and so ordered, that the complaint in each case should be dismissed for the alleged reason that there was no proof of negligence on the part of any employee of the government which could be said to constitute the proximate cause of the death of the Dye brothers and King. From the evidence adduced, much of which has been detailed, we think this conclusion of the District Court was clearly erroneous.

The Court distinguished cases cited by appellants' attorneys upon reasoning that, in the present cases, it was not denied that Dam 41 is constructed skillfully under valid authority of an Act of Congress, State of Arizona v. California, 283 U.S. 423, 452, 457, 51 S.Ct. 522, 75 L.Ed. 1154, and that the federal government has authority to create obstructions in the river for the purpose of improving navigation. Apparently the able judge considered that the United States could not lawfully be held responsible for the loss of lives in the cases at bar, inasmuch as the obstruction in the river had been skillfully constructed under valid authority of the Congress. The Court did not seem to regard it as decisive, in the circumstances of the cases, to determine whether the United States owed to the public, including appellants'

intestates, the duty to give adequate warning of the risk involved in operating small boats in the Ohio River near Dam 41; and, if so, whether the government had fulfilled that duty.

■ The three decedents undoubtedly were traveling lawfully on the Ohio River. That river is a navigable stream and a public highway of common right upon which small boats have an equal right of navigation with larger craft, including steamboats. See Monongahela River Consolidated Coal & Coke Company v. Lancaster's Administrator, 169 Ky. 24, 30, 183 S.W. 258. See also Floyd County v. Allen, 190 Ky. 532, 227 S.W. 994; 56 Am.Jur., Waters, sec. 209, page 671.

■ Although the dam was constructed under lawful authority, a duty rested upon the operator of the dam to give adequate warning of a dangerous condition, when existing, and a failure to do so would impose liability upon the operator. The fact that the United States Government through its agency, rather than an individual or private corporation, was the operator does not except it from liability for negligent operation, or for negligent failure to warn. The Federal Tort Claims Act, in Title 28, § 1346(b), U.S.C.A., vests the District Courts of the United States with original jurisdiction, concurrent with the Court of Claims, "of civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*" [Italics supplied.]

The Supreme Court, in United States v. Yellow Cab Co., 340 U.S. 543, 547, 550, 71 S.Ct. 399, 95 L.Ed. 523, said that the Federal Tort Claims Act, in sweeping language, waives in favor of an injured person the government's immunity from suit; and that the general trend toward increasing the scope of the waiver by the United States of its sovereign immunity from suit is inconsistent with whittling it down by refinements. In Spelar v. United States, 2 Cir., 171 F.2d 208, 209, it was held that the policy of governmental generosity toward tort claimants established by the Federal Tort Claims Act should not be set aside or hampered by a niggardly construction, particularly with respect to the broad terms of coverage.

In the following federal decisions, among others, the government was held liable under the Federal Tort Claims Act for injuries resulting from the negligence of its agents, or from their failure to give reasonable and adequate notice of existing danger: Brown v. United States, D.C.S.D.W.Va., 99 F.Supp. 685; Skeels v. United States, D.C.W.D.La., 72 F.Supp. 372; White v. United States, D.C.N.D.Cal., 97 F.Supp. 12; State of Maryland v. Manor Real Estate & Trust Co., 4 Cir., 176 F.2d 414; Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631, 634.

■ The Federal Tort Claims Act expressly makes the law of the place where the negligent or unlawful act or omission occurred the controlling law. Wherefore, in this case, Kentucky law governs. Upon principles established by the law of Kentucky, the government, in the instant case, was negligent in its failure to use protective measures for the benefit of navigators and to give adequate warning of the dangerous condition at the dam to small boats navigating near it. Brown Hotel Co., Inc. v. Sizemore, 303 Ky. 431, 197 S.W.2d 911; Illinois Central R. R. Co. v. Peebles, 216 Ky. 9, 287 S.W. 574; City of Ashland v. Williams, 203 Ky. 300, 305, 262 S.W. 273; McLaughlin v. Louisville Electric Light Co., 100 Ky. 173, 37 S.W. 851, 34 L.R.A. 812.

None of these Kentucky cases is directly in point, but all indicate by analogy the standard of duty placed upon the appellee, which, in our judgment, was

not adequately performed in this case. We think that, on the whole record, it has been demonstrated that the United States was negligent as a matter of law in its method of operating Dam 41 and in its failure adequately to warn persons traveling in small boats on the Ohio River [a public highway] of the dangerous condition of the river when the 1,200 wickets were down.

Accordingly, the judgments of the District Court are reversed and judgments in favor of the three appellants are directed to be entered; and the case is remanded to the District Court solely for determination of the appropriate damages to which each of the three respective appellants is lawfully entitled.