**Judith BEELER, a minor, by Charles Beeler and Ruth Beeler, her parents and natural guardians and Charles Beeler and Ruth Beeler in their own right, Libellants,**

v.

**UNITED STATES of America, Respondent,**
and
**Eugene Kober, Respondent-Impleaded.**

**No. 65–3.**

United States District Court
W. D. Pennsylvania.

March 14, 1966.

John Feeney, Pittsburgh, Pa., for libellants.

Daniel Leach, Atty., Dept. of Justice, Washington, D. C., and Sebastian Pugliese, Jr., Asst. U. S. Atty., Pittsburgh, Pa., for respondent.

## OPINION

WILLSON, District Judge.

Libellant Judith Beeler, a minor, was injured when the outboard motorboat in which she was a passenger went over the crest of dam 7 in the Allegheny River near Kittanning, Pennsylvania, in this district on June 12, 1961. Alleging that Judith Beeler's injuries were the proximate result of the negligence of the United States, in that employees of the Corps of Engineers, United States Army, did not properly locate signs warning of the dam so as to be visible to craft on the river, Charles Beeler and Ruth Beeler, as parents and natural guardians of Judith Beeler and on her behalf, and also in their own right, instituted this action against the United States. This suit was originally brought under the provisions of the Federal Tort Claims Act (28 U.S.C. § 1346) with a demand for a jury trial. However, when it was determined that libellants' exclusive remedy upon this maritime cause of action lay under the Suits in Admiralty Act (46 U.S.C. § 741 et seq.), libellants were permitted to amend their complaint to bring their cause within the provisions of the latter statute. See 338 F.2d 687, (3d Cir. 1964). Subsequently, respondent United States was permitted, under Admiralty Rule 56, to implead as a respondent Eugene Kober, operator of the boat in which Judith Beeler received her injuries.[1] In so impleading Kober, the United States alleged that it was his negligence in the operation of the boat which was the sole cause of the injuries received by Judith Beeler.

The case has been tried non-jury on the issue of liability only. The testimony taken at the trial has been transcribed and has been fully considered as have the briefs of counsel.

Dam 7 is one of eight such structures located on the Allegheny River. These dams and concomitant locks allow slackwater navigation of the river for a distance of some 72 miles above its mouth at Pittsburgh. The construction of dam 7 was authorized under the River and Harbor Act of July 25, 1912, c. 253, 37 Stat. 201. Actual construction took place between 1928 and 1931, and the lock was opened to navigation in 1930. Dam 7 is a fixed-crest dam, that is, it is so constructed that the crest of the dam is normally submerged below the surface of the river water flowing over it. Thus, no portion of the dam itself is visible to the boater approaching from upstream. The dam lock is on the right bank going downstream.

The dam is 916 feet in length from the abutments on the left bank to the river wall of the lock on the right bank. The lock chamber is 360 feet long and 56 feet wide. The river wall extends some 200 feet and the guide wall or land wall extends some 350 feet upriver from the dam. Both walls rise some 10 feet above the crest of the dam, but because of the high stage of the river on the day of the accident, approximately 6 feet of the walls were above water. The river wall is painted in diagonal stripes of black and white for a distance of 15 feet from its upstream end. Also extending above the surface of the river is the lockhouse, which is located next to and rises above the land wall. The river channel has been maintained to project depth of 9 feet.

Dam 1 was abandoned years ago. Dam 2 is at Aspinwall near the Highland Park Bridge in Pittsburgh. Dams 3, 4, 5, and 6 lie between dam 2 and dam 7, which is just above the Kittanning Bridge. Dams 8 and 9 are above Kittanning. In recent years there has been little commercial navigation through the lock at dam 7, but that lock—as have the other locks—has been maintained in operable condition and has handled considerable pleasure boat traffic. The Lockmaster testified, for instance, that at lock 7 he handled 50 lockages a day during the pleasure boating season and with each

---

1. Although Judith Beeler and Eugene Kober were married before the commencement of this action, she will be referred to by her maiden name throughout this opinion.

lockage often containing as many as 20 boats. From a width of about 1000 feet at the dam the water pool widens out to a width of approximately 1500 feet approximately 1000 feet above the dam.

There is no dispute as to how the accident occurred. The facts concerning the happening of the accident were established by the testimony of libellants' witnesses. Eugene Kober, respondent-impleaded, testified that at the time of the accident, he was 20 years of age. His family had owned boats for several years, and in 1961 owned a 16-foot fiberglas boat equipped with a 70 horsepower outboard motor. The boat had 2 split bench-type seats running athwartships. The controls for the boat, a steering wheel and a hand throttle-gear change mechanism, were located at the right front seat of the boat and connected with the outboard motor by means of cables running through blocks. This boat was kept at the Kober home and transported by trailer to wherever the family boated. Kober's boating, for some 4 or 5 years prior to 1961, had been done exclusively on Lake Chautauqua, New York, although for 2 or 3 years previous to that, he had boated on the Allegheny River near Oakmont and Highland Park, more than 30 miles downstream from dam 7. Kober had not operated a boat anywhere during the 2 seasons previous to 1961. During his earlier boating on the Allegheny, Kober had been aboard a boat which had passed through the lock at Oakmont, and had boated in the vicinity of other dams and locks.

Kober's first boating on the Allegheny in 5 to 7 years took place just 2 days prior to the accident. On Saturday, June 10, 1961, Kober transported the boat to a friend's cottage near Mosgrove, Pennsylvania, on the Allegheny River upstream some 6 miles from dam 7 at Kittanning. On that day, Kober launched the boat at Mosgrove, but did not venture more than a mile in any direction on the river, and meeting with no untoward events, left the boat at Mosgrove and returned home.

The following Monday, June 12, 1961, Kober returned to Mosgrove at about one o'clock in the afternoon. Other than the Saturday preceding, he had not been on the Allegheny River at Mosgrove for more than 5 years, and only 10 or 15 times then. Although he was unfamiliar with the river, he apparently took no measures to acquaint himself with its characteristics, for he testified that he knew nothing of the currents, shoals, or obstructions in the river other than that there was a sandbar at Mosgrove. He knew that there was a dam at Kittanning downstream from Mosgrove, having seen it at times from the highway which he traversed on his way to Mosgrove. He did not know exactly how far distant this dam was from Mosgrove, but felt that the distance was between 5 and 10 miles. He was unaware of the existence of river charts, and hence neither possessed nor consulted any to determine the location of the dam, which was in fact 6 miles below Mosgrove. Prior to that Monday, Kober had but rarely ventured farther than 2 or 3 miles from his dock.

That Monday afternoon, Kober was accompanied by Judith Beeler and her brother Charles—neither of them an experienced boater. The three of them launched the boat at about 3 o'clock, and with no particular destination or activity in mind, proceeded downstream. About halfway downstream to the dam, they put in for some refreshments, but did not inquire about the dam and instead continued downstream.

Kober was in the front seat, operating the boat, while Judith Beeler and her brother were perched on the backs of the rear seats, on either side of the boat. The weather was clear with the sun shining, visibility was good, but the water surface was somewhat rough. The speed of the boat as it proceeded downstream was between 20 and 25 miles per hour. At this speed the boat planes and as it had been raining the day before Kober testified that he was concerned about logs and other debris which might be in his course.

The highway bridge across the river below the dam at Kittanning is visible 2 miles upstream and was in Kober's line of vision had he chosen to look at it. Although he knew that the dam was located upstream from the bridge, he did not diminish his speed. The boat was midstream, and while Kober saw the banks of the river from time to time, he was not paying particular attention to them. In his words, he—"wasn't exactly looking for"—any signs warning him of the dam. He saw the lockhouse and the lock walls, but did not recognize them as such; he was vaguely familiar with locks, but he assumed, from what experience he had had with locks, that the lock would be on the left bank of the river.

Kober was not aware of the dam until he was about 50 feet upstream from it, when he first saw the turbulence below the dam caused by the cascading water of the river. Believing that he could not turn the boat in time to avoid the dam, he opened the throttle,—as he had been taught to do should he encounter a situation of this sort—and shot over the dam. Contact with the water in the lower pool was solid, and the boat did not capsize. Judith Beeler was thrown off her perch and onto the sole of the boat, and thereby sustained the injuries which occasioned this action.

Lieutenant Commander Rudolph E. Anderson, United States Coast Guard, called by libellants, testified that from upstream, seeing the dam was difficult, but that if a person were—"looking and with a discerning eye"—he could see the break in the water indicating the presence of the dam from about 200 feet upstream. According to Commander Anderson, the Coast Guard responsibility extends to placement and maintenance of buoys and other navigation aids which mark the channel of the river. 14 U.S. C.A. § 2; 33 C.F.R. § 62.01-1, (1962). And there were no regulations requiring the Coast Guard to post warnings to boaters in the proximity of the dams, and therefore, none were posted by the Coast Guard. He, however, testified that there are available the usual navigation charts of the river, showing the dams, lists of lights, as well as rules of the road, and that these publications are available generally to the public.

At this point it is well to note that there are no contradictions in the testimony of any of the witnesses. The case is unique in that respect. The issue is whether—from what the witnesses have said and from the exhibits—the evidence points to liability or non-liability. On behalf of the Government, it seems to the Court that the testimony of Richard L. Whitehead, Chief of the Operations Division of the Pittsburgh District of the Corps of Engineers, U. S. Army, is crucial. He was called as a witness by the libellant. Mr. Whitehead had been with the Pittsburgh District for 34 years and had held various positions in the operations division, which has general supervision of the navigation and flood control structures on the Allegheny River. Mr. Whitehead declared that the Corps had been aware for some time that the dams posed dangers to inexperienced boaters. According to the witness the noticeable increase in pleasure boating on the river commenced about 1950. Noticing the increase in boating on the river between Memorial Day and Labor Day, the engineers commenced a study of the problem of what additional warnings should be given as to the location of the dams. At about this time, the Corps attempted to publicize the dangers to be encountered in the vicinity of dams, by means of leaflets, pamphlets and notices distributed to boat clubs, dock concessionaires, marinas, and the like. These publications have been an attempt to educate the boating public, before they embark upon the river, to the location of the dams, the difficulty of perceiving a dam from upstream, and the landmarks which would aid a boater in avoiding danger. A one-sheet broadside, entitled—"Be 'Dam' Conscious"—was offered as an example of the publicity efforts of the Corps. This broadside apparently has been used since 1953, and contains a schematic diagram of the Allegheny River, showing the location of

the eight dams, and setting forth several precepts to be followed to insure safe boating. In addition, the Corps issues and distributes a—"Notice to Navigation Interests"—to call attention to various aspects of the safety program.

In order to warn those already on the river in the proximity of the dams, the Corps has undertaken the design, construction and maintenance of signs and markers calling attention to the dam. The program, Mr. Whitehead explained, has been largely experimental in approach in that several types of signs and markers have been tried in various places, and where a particular device seems effective, it has been installed at other places. Suggestions for improvement of the warning system have come from within the Corps and from boaters themselves, and consideration has been given to each. In 1950, for example, the Corps first erected signs, some 3 feet by 5 feet in size, on the upstream end of the lock walls, proclaiming in 8 by 5 inch letters—"DANGER—DAM / SMALL CRAFT / KEEP 500 FEET AWAY / CORPS OF ENGINEERS, U. S. ARMY / PITTSBURGH DISTRICT." A sign of this type was on the lock wall of dam 7 at the time of the accident. In 1955, larger signs were erected on both banks of the river as additional warning to the approach of dam 7. Each sign was erected 1000 feet upstream from the dam. These signs were 8 by 10 feet in size, with black letters on a yellow ground. On the right bank above dam 7, the sign proclaimed in letters 16 by 11 inches— "DANGER—DAM"—and in slightly smaller letters—"1000 FEET DOWNSTREAM / APPROACHING LOCK / FOLLOW THIS SHORE / CORPS OF ENGINEERS, U. S. ARMY." On the left bank, the sign reads—"DANGER" in 16 inch letters, and in slightly smaller letters—"APPROACHING DAM / SMALL CRAFT / STAY ABOVE THIS POINT / CORPS OF ENGINEERS, U. S. ARMY." It was Mr. Whitehead's opinion that in selecting sign and letter size, some sort of background or reference material on visibility was consulted.

With regard to these signs, the Lockmaster testified that it was his duty to repaint and maintain them, making sure that he repainted them annually and making sure each summer that no vegetation obstructed a view of these signs from the river, and that they were not obstructed on the day of the accident.

In 1959, the Corps began experimenting with midstream warning signs located about 1,000 feet above the dams. The first experimental midstream signs were placed above dams 2 and 3 only, for the reasons that—more boating occurred in these pools than in other pools, dams 2 and 3 were higher and had different slopes than dam 7, there was a question as to whether the midstream signs would withstand the high water, it was questionable whether these signs would in fact prove beneficial in educating the public about the dams, and the Corps had to determine whether the signs would be a hazard to navigation. The first signs were erected on tripods fastened to the river bottom. In 1963, the Corps felt that midstream signs were a valuable supplement to the bank signs, and placed midstream signs above dams 4, 5, 6 and 7. Damage to the tripod at dam 7 from ice in the spring of 1964 occurred, as the Corps had feared, and the tripod had to be cut away and replaced with a float which can be removed at the end of the boating season.

Another type of warning device was developed by the Corps in 1957 and consisted of discs about 18 inches in diameter mounted on stanchions set into the holes in the crest of the dam. These markers, or donut markers so called, placed at intervals across the dam, were painted with red reflector material so as to be visible day or night. By 1961, these markers were in use at all 8 dams. But these markers, mounted as they are on stanchions 1½ inch in diameter, required removal after the boating season each fall, as the ice and high water would carry them away. These markers are replaced at the start of the summer season each year as soon as the water depth at the crest of the dam falls to 1 foot in

depth. In any greater depth of water flowing over the crest, these markers cannot be erected because they are placed by backing a small skiff in the stream to the crest of the dam and inserting the metal stanchion, and this cannot be done in high water. A daily gauge record is maintained which shows the amount of water flowing over the crest of the dam. Mr. Whitehead testified to the readings commencing April 18, 1961. On the date of the accident—June 12th—the water was flowing at the crest of between 3 and 3.2 feet. At no time in the spring of 1961 had the water dropped to a point where it was considered safe to erect the donut markers. But the employees had in mind to erect those markers as soon the water would permit.

■■ It is clear that prior to the 1960 amendment to the Suits in Admiralty Act, no proceeding such as this could have been maintained in admiralty against the United States. Steamtug Aladdin, Inc. v. City of Boston, 163 F. Supp. 499, (D.Mass.1958). However, the 1960 amendment, which added the words —"or if a private person or property were involved"—to Section 742 of the Act, was for the purpose of making clear the jurisdiction of the admiralty side of the district courts over matters involving property of the United States. 1960 U.S. Code Cong. and Admin.News, pp. 3583, 3585. In Steamtug Aladdin, libellant's vessel was struck by a timber projecting from a bridge which had been abandoned by the city to the United States. In dismissing the libel, Judge Wyzanski reasoned that there was no statutory duty upon the United States to light or maintain the bridge; that both at common law and in admiralty there was a duty imposed on those in control of a structure such as a bridge to exercise due care in maintaining it; that absent a statute, this duty, while it rested upon others, could not be imposed upon the United States because of its sovereign immunity. But the 1960 Amendment now casts upon the United States the same duty of care that private persons have had. As this Court understands it, there is no practical difference with regard to the duty of the United States under the Federal Tort Claims Act and the Suits in Admiralty Act. See Dye v. United States, 210 F.2d 123, (6th Cir. 1954).

Libellants' theory of this case, if it may be telescoped, is that Judith Beeler received her injuries because the boat went over the dam, that the boat went over the dam because Eugene Kober had no warning of the presence of the dam, that Eugene Kober had no warning of the presence of the dam because the United States was negligent in the design, construction and erection of signs warning river users of the dam, and that therefore the United States is liable to libellants.

The slack-water navigation project, of which dam 7 is a part, has been a concept for more than 50 years and an actuality for more than 30. It is unquestioned that dam 7 on the day of the accident was in the same position and operated in the same way that it had been during the previous 30 years. During that time, many river users had availed themselves of the locks and doubtless many others had boated in the vicinity, without the occurrence of an accident such as this. Louis Grafton, who was Lockmaster at dam 7 on the date of the accident, testified for respondent that in the 25 years he had worked at that dam, the accident involving Judith Beeler was the first of that type at that dam. There has been no allegation that the accident was caused by any act of the government in altering the physical characteristics of the dam or locks, or in changing the flow of the water over the dam. All these dams on the Allegheny are shown on the river charts, and the dangers are self-evident to knowledgeable persons. Commercial navigators use the charts and know the sailing channel. Mr. Kober did not use a chart, nor did he know the sailing channel.

Congress very early charged the Coast Guard with the responsibility of charting the navigable rivers of the country, including the maintenance of buoys and

the navigation aids which mark the channels. As indicated this was done by the Coast Guard at Pittsburgh. No doubt this was sufficient for commercial operators, but when the dams were constructed in the late twenties, the Corps of Engineers assumed the responsibility for the operation of the locks and the maintenance of the dams. This placed a different and greater responsibility upon the Corps of Engineers than the Coast Guard had. It appears to this Court that the Corps of Engineers has accepted its responsibility with regard to warnings to be given to inexperienced boaters on the Allegheny River.

The Corps of Engineers has been aware of the special problems presented by the increase in pleasure boating on the Allegheny River. The evidence shows that the Corps has realized that some means other than conventional navigational aids were necessary in an attempt to prevent accidents to the inexperienced. The evidence indicates that the Corps has undertaken a continuing program of research and experimentation with signs and markers in an effort to make explicit to the inexperienced user the proximity and danger of dams.

It cannot be said, on the basis of the evidence adduced at trial, that the warning signs above dam 7 were negligently designed, constructed or maintained. This Court finds that the reverse is true. That is, that they were designed, constructed and maintained in a proper manner which would give warning to anyone who casually looked in their direction from any point on the river. On the basis of Kober's testimony, it cannot be held that the signs were illegible, for he declared that he—"wasn't exactly looking for"—any signs. One of these signs was brought into Court. This Court finds that the sign brought in was not only visible, but could have been read at least 1,000 feet away. In the opinion of this Court, the Government's action in regard to devices and warnings on the above dam 7 at the time of the accident was reasonable, that no negligence on the part of the Government has been shown,

and that the United States cannot be held liable to libellants in this case. Counsel have presented and discussed in their briefs several decisions which have held the Government liable but which are based on dissimilar factual situations.

In Dye v. United States, 210 F.2d 123 (6th Cir. 1954), plaintiffs' decedents were drawn over a dam in the Ohio to their deaths by an increase in current caused by defendant's employees. The dam was constructed in part of movable wickets which when opened considerably increased the flow and current of the water of the river over the dam. Although the dam may have been safe when the wickets were closed, the public had no means of knowing whether the wickets were open or shut, and there was no sign explicitly warning of the danger created by the open wickets. Further, it was apparent in Dye that the government employee whose duty it was to keep a lookout for boats approaching the dam when the wickets were down or open did not do so on the day of the accident.

Bevilacqua v. United States, 122 F. Supp. 493 (W.D.Pa.1954) involved dam 8 on the Allegheny. Plaintiffs' decedents were killed when their boat plunged over the dam in the darkness of night. The presence of the dam was marked by warning lights when the lock was in operation, and by warning lanterns similarly placed when the lock was not operating. On the night of the accident, the duty lockman failed to light the lanterns, so no warning was given.

In Chelette v. United States, 228 F. Supp. 653, (E.D.Tex.1964), an action brought under the Suits in Admiralty Act, libellant's boat struck a log floating in the river channel. The log was part of much debris which had been pushed into the channel by Government workmen cleaning up a Reserve Fleet nest area.

Judgment will be directed for the United States. It is so ordered. Pursuant to Admiralty Rule 46½ this opinion constitutes the Court's findings of fact and conclusions of law.