**Glenda Riley LITTLE et al.**
**v.**
**UNITED STATES of America.**
**Civ. A. No. 67–1193.**

United States District Court
E. D. Louisiana,
New Orleans Division.
Sept. 27, 1968.

Polack, Rosenberg, & Rittenberg, by Robert G. Polack, New Orleans, La., for plaintiffs.

Louis C. LaCour, U. S. Atty., Joan Elaine Chauvin, Asst. U. S. Atty., New Orleans, La., Hall Baetz, T. A., Lawrence F. Ledebur, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for defendant.

MITCHELL, District Judge.

The plaintiff, Glenda Riley Little, brought suit on behalf of herself individually, as administratrix of the Succession of her deceased husband and as Natural Tutrix of her minor children against the United States of America under the Suits in Admiralty Act to recover damages for the death of her husband, Edward R. Little, Jr., who drowned in the Boque Chitto River on August 18, 1966.

The Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I

The Pearl River Navigation Canal is a navigable waterway, built and maintained by the U. S. Army Corps of Engineers. The canal has three locks, and, in order to provide a minimum depth in the pool between locks two and three, a low dam, or "sill", was constructed across the Boque Chitto River, causing water to back up into the canal. The sill completely obstructs navigation on the Boque Chitto River.

### II

The Boque Chitto Sill extends across the center of the river for a distance of 250 feet linking up with concrete abutments which extend out into the river from both banks. Depending upon the discharge of the Boque Chitto, the water going over the sill may drop as much as five feet into the lower pool, or there may be no drop at all.

### III

Five warning signs were posted in the area of the sill by the Corps of Engineers. These signs were intended to ensure that those who did not know, or have reason to know, of the existence of the sill would be aware of the dangers it created.

### IV

During the period of August 14 through 17, 1966, heavy rain fell at various places in the Boque Chitto River basin upstream from the sill. This rainfall caused the river to rise several inches at the sill on the morning of the 18th.

### V

On August 17, 1966, the decedent, Edward R. Little, his wife and three children crossed the Boque Chitto Sill to reach his fishing camp on the Boque Chitto River. To negotiate the sill, Little used a manually operated "winch hoist" which had been erected on the concrete abutment on the left descending bank of the river in 1959 by unknown persons.

### VI

Having traversed the sill innumerable times, Little was completely familiar with the sill, its currents and dangers. He also was aware, or he should have been, of the warning signs that the Corps of Engineers had posted in the vicinity of the sill.

### VII

Using the hoist, Little lifted his boat over the sill and proceeded downstream to his camp. The following day, due to rising water, the Littles decided to cut short their stay and return home. As they proceeded upstream, everyone in the boat except Mr. Little wore life

jackets, and one was available for his use.

## VIII

Upon arriving at the sill, everyone but Little's youngest son left the boat. Little attached the hoist to hooks on each side of the boat. About this time Gary Rushing and Pete Holloway approached the sill from upstream and, observing a strong current near the sill, Rushing and Holloway landed on the left descending bank about 15 to 20 feet upstream from the abutment on which the hoist was located. They approached the hoist to get the cable ready to lift their boat downstream.

## IX

The concrete abutment at the sill extended out into the river about 14 feet. The abutment created an eddy in the upper pool where the current was very slow, providing a refuge for boats after they had made the portage over the sill.

## X

Rushing observed Mr. Little preparing to lift his boat and volunteered to operate the winch. Little's boat was lifted over the sill without incident and was dropped in the eddy behind the abutment. Its bow was pulled to the bank; Little's son debarked; and Little boarded while his wife held the bow line.

## XI

Several courses of action were available to Mr. Little once the portage was accomplished. The bow line was quite long, and with it he could have stood on the shore and pulled his loaded boat upstream. As noted, the water in the eddy created by the abutment was up to two and one-half feet deep. His boat was equipped with a paddle which could have been used to paddle upstream along the shoreline. He could have waded his boat to a point where he could navigate without being subjected to the strong currents at the sill's crest. He could have dragged his boat upstream along the bank. He could have turned his boat around and proceeded bow out, and then angled up into the current. He did none of these things. Instead he deliberately chose the most hazardous route possible under the conditions prevailing. He started his motor, repeatedly requested and finally demanded that his wife release the bow line, which she did reluctantly, after which he immediately backed into the current. He backed directly *across* the current and parallel to the sill, and continued out until he could turn his bow *downstream*. When his bow cleared the abutment, he pointed the boat downstream and then, hovering on the crest of the dam where the current was the strongest, in a loaded boat with its blunt end into the current, he tried to back upstream. The boat was heavy with equipment and gear; Little sat in the stern next to the outboard motor; and the motor was in reverse, all of which factors, in combination, pushed his stern deeper into the water. The current, pushing powerfully against the boat's blunt end, prevented movement upstream; the small outboard was not powerful enough to offset its effect; and the boat, inevitably, was forced over the edge of the sill. It landed upright in the pool five feet below, but backed under the falling water, filled and capsized. Little was not wearing a life jacket. He tried to hold on to his boat but failed and, being unable to swim to safety, he drowned.

## CONCLUSIONS OF LAW

### I

The Court has jurisdiction of this action in admiralty and venue is properly laid in the Eastern District of Louisiana, New Orleans Division.[1]

### II

 One who owns or operates a sill or dam is under a duty to warn users of the waterway of the dangers of such a sill.[2] The defendant, United

---

1. 28 U.S.C. § 1333, 46 U.S.C. § 761.

2. Dye v. United States, 210 F.2d 123 (CA 6–1954); Empire District Electric

584

States of America, completely fulfilled this obligation and liability therefore cannot rest upon failure to warn of a hidden danger.

### III

■ Further, there is no duty to warn of an obvious danger or to warn someone who is aware of a dangerous condition.[3]

■ Plaintiff has also sought relief under the theory that the United States had a duty to construct a portage around the sill. However, in law, no such duty exists. As set forth succinctly in United States v. Commodore Park,[4] the government has the power to block navigation at one place to foster it at another based upon its authority to regulate commerce. When such obstructions are created, the only duty is to give adequate warning of its existence.

### V

■ As an additional ground for relief plaintiff contended that the United States was negligent in failing to remove the winch hoist located at the Boque Chitto Sill. This argument must also fall as the operation of the hoist in no way contributed to the accident suffered by plaintiff's decedent. The evidence in the record clearly establishes that the hoist functioned flawlessly.

### VI

■ Pretermitting the fact that the plaintiff has failed to establish any negligence on the part of the United States, the plaintiff would nevertheless be barred from recovery under the theory of contributory negligence and assumption of risk. Under the wrong-

ful death statute of the State of Louisiana[5] contributory negligence and assumption of risk bar recovery.[6] In applying state wrongful death statutes, the federal district court must recognize all defenses against such claims that would be available to a defendant in a state court.[7]

"Where * * * state death acts are adopted within the framework of the law of admiralty, they must be accepted on their face and with whatever limitations are inherent in the right as granted by the state."

Let judgment for the defendant be entered accordingly.

Co. v. Rupert, 199 F.2d 941 (CA 8–1962) cert. den. 345 U.S. 909, 73 S.Ct. 649, 97 L.Ed. 1344 (1953); Beeler v. United States, 256 F.Supp. 771 (WD Pa.–1966).

3. Empire District Electric Co. v. Rupert, supra; Harris v. United States, 154 F. Supp. 46 (WD Ky.–1957).

4. 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945).

5. La.CC 2315.

6. Byrd v. Napoleon Avenue Ferry Co., 125 F.Supp. 573 (ED La.–1954); Chabert v. Lumbermen's Mutual Cas. Co., 196 So.2d 316 (La.App.–1966).

7. Hartford Accident & Indem. Co. v. Gulf Ref. Co., 230 F.2d 346 (CA 5–1956); McManus v. Lykes Bros. S. S. Co., 275 F.Supp. 361 (ED La.–1967).