# THE SULPHITE.

# THE DELKOTE.

# THE MARTIN MULLEN.
## No. 4401.

District Court, E. D. Michigan, S. D.
Sept. 19, 1947.

Leckie, McCreary, Schlitz & Hinslea, by Lucian Y. Ray, all of Cleveland, Ohio, for libelant and cross-respondent.

Hill, Hamblen, Essery & Lewis, by Carl V. Essery, all of Detroit, Mich., for libelant and cross-respondent.

Foster, Lott & Lutz, by Allan B. Lutz, all of Detroit, Mich., for respondent and claimant and cross-libelant.

KOSCINSKI, District Judge.

This case, which involves cross-actions brought by the Pioneer Steamship Company as owner and operator of the Steamer Martin Mullen, and by the Driftwood Lands and Timber, Ltd., as owner and operator of the Steam Tug Sulphite and the Barge Delkote, arises out of a collision which occurred between the Steamer Martin Mullen and the Barge Delkote, which was being towed light by the Tug Sulphite, during the late afternoon or early evening of April 26, 1944, near the lower end of the southeast pier of the Canadian lock at Sault Ste. Marie, Ontario. The actions are in rem against the respective vessels, with each

138

owner having appeared as claimant having furnished the required stipulation for value, in lieu of attachment. The Pioneer Steamship Company claims damages in the amount of $21,416.24, and Driftwood Lands and Timber, Ltd., claims damages in the sum of $14,217.15. In conformance with the usual practice, in Admiralty, the sole issue before the court is the question of liability.

### Findings of Fact.

1. The Steamer Martin Mullen is a steel vessel of the bulk freighter type. She was loaded with a cargo of grain and was en route from Port Arthur, Ontario, to Buffalo, New York. Her length, overall, is 414 feet, her beam is 50 feet, and her moulded depth is 28 feet. During the times mentioned herein her draft, forward, was 16 feet 6 inches, and her draft, aft, was 16 feet 10 inches.

2. The Tug Sulphite is a steam tug of steel construction, 142 feet long between perpendiculars, beam 26 feet, and a moulded depth of 21 feet. She has a triple expansion engine which developed a rated horse-power of 750. The Barge Delkote is a steel vessel without motive power of her own, length 352 feet, beam 44 feet, and moulded depth of 26 feet. Her draft, during the times herein mentioned, was 7 feet 6 inches forward and 6 feet 4 inches aft.

3. The log entries as to the time of the collision vary. Mullen's log times it at 6:22 P.M. and Sulphite's at 7:10 P.M. After comparing the testimony on the elapsed time of the navigation of the two vessels and the distances covered, I find that the collision occurred approximately at 6:14 P.M. The collision occurred during daylight hours, the weather was clear, visibility good, and there was a light northwest wind of approximately 20 miles an hour. There were no other vessels in the vicinity at the time.

4. There are two piers extending from the lock walls—the north pier about 1000 feet long, extending due east, and the south pier, also referred to as the southeast pier, about 1700 feet in length, gradually slanting in a southeasterly direction. There is a range light on the end of each pier. Approximately at the center of the southeast pier, at a point referred to as "knuckle," the pier curves more decidedly southeastwardly.

5. The place of the collision was at a point about 100 feet beyond the southeast pier. The navigable channel at that point is about 450 feet wide. The shoal waters east and west of this area are 13 to 14 feet deep. The channel range waters are marked by two red stakes on the east side of the channel and two black stakes west of the channel indicating the navigable area for the guidance of vessels.

6. There is a current 1½ to 2 miles an hour coming down from the Power Canal north of the locks, down near the end of the southeast pier. It runs a little from right to left of the downbound range line. The wind was a little on the Mullen's starboard quarter, aft of amidships as she was heading down the pier. It has not been satisfactorily established that the navigation of the vessels involved was appreciably affected to any degree by the current.

7. As the Mullen was leaving the lock, downbound, her master, Captain Regan, and his ship's lookout simultaneously observed the Tug Sulphite and the Barge Delkote approximately 2500 feet ahead. The tug and barge appeared to the Mullen's master to be stationary and it also appeared to him that the tug was alongside the barge, about 175 feet east of the channel range, and about 40 feet off the Algoma Central & Hudson Bay Railway Company dock on the Canadian side. Captain Regan testified: "I did not know that she was going to take a barge, or if she was coming up, or what she was doing, so I blew one whistle to find out whether the man was coming ahead or what." The Sulphite answered with one whistle, and thereby a port-to-port passing was agreed upon. Captain Regan then watched the stern of his boat going over the sill of the lock. A moment later he observed the flotilla coming ahead.

8. The tug with its tow—the tow line was about 75 feet—left the Canada Steamship dock, which is separated only by a slip from the Algoma dock, at 6:50 P.M. E.W.T.

Captain Garrett, her master, noting that the red light was against him at the lock, blew three long and two short whistles—the required signal of intention to enter the lock—and proceeded to the starboard side of the channel, upstream, in a northwesterly direction. At that moment the Mullen was still in the lock, and her master did not hear that signal.

9. The stern of the Mullen cleared the sill of the lock at 7:08 P.M. Eastern War Time, or 6:08 P.M. Eastern Standard Time. Before the stern of the Mullen passed the sill of the lock her engines were stopped, pursuant to regulations. After clearing the sill the Mullen put her engines full speed ahead in order to get steerageway on the boat, since, due to the narrowness of the lock the ship scarcely had any headway coming out of it.

10. At the time of the exchange of the passing signals the flotilla was slightly on the Mullen's starboard. The distance between the two vessels was not less than 1800 feet, the tug being about 600 feet beyond the south pier. The Mullen's speed was about 2½ to 4 miles an hour, but that she was in reverse a full two minutes before the collision; the tug's speed was 1½ to 1¾ miles an hour, but at the time of the collision 4 miles an hour. A witness for cross-libelant, one Robert Trinter, first mate on the Steamer McGonagle, then locking through the American locks, about ¾ mile south of the position of the colliding vessels, stated in a deposition that he looked through binoculars and that the Mullen's speed was 5 to 6 miles an hour until the time of the collision. However, he admits that he did not see and hear all that transpired before the collision. His testimony in these important details is unreliable, and far from convincing. Furthermore, his flippant manner in answering questions does not beget confidence in the accuracy of his observations.

11. The Mullen, in conformity with the one-blast exchange, continued on a course a little to the right of the center of the channel. When the bow of the Mullen was passing the "knuckle" on the southeast pier the tug and its tow were still on the Mullen's starboard, as they were when the passing signal was agreed to. In negotiating the curve at the "knuckle," the Mullen's starboard was about 50 feet abreast of the southeast pier, and her port bow on the center line of the channel or a little over.

12. In this position, Captain Regan noticed that the Sulphite was not changing her course pursuant to the port-to-port passing agreement but was heading on a course which would intersect the course of the Mullen. Captain Regan thereupon stopped the engines of the Mullen, blew an alarm signal of five short blasts of the whistle and put his boat full speed astern. The Sulphite made no reply to the alarm signal and did not slacken her speed, but increased it to 4 miles an hour. In this maneuver the Sulphite crossed the Mullen's bow, from starboard to port. The heading of the Sulphite was now nearly parallel to the Mullen's course, but in opposite direction and on the Mullen's port side. As the tug was passing the Mullen in close proximity, the master of the Mullen stepped out of his pilot house and shouted to the Sulphite to release the tow line, since a collision with the barge seemed inevitable. This was done; and, within seconds thereafter, the bow of the Mullen came together with the port bow of the Barge Delkote. At the time of the collision the Mullen's starboard bow was within 24 feet off the southeast pier and the Mullen was in full reverse and was practically stopped for nearly two minutes before the collision.

13. When the port-to-port passing was agreed upon, the Sulphite did not alter her bearing to her starboard, but maintained the same course and heading, although she had room enough to alter her course to starboard and keep out of the Mullen's way. When the danger signal was sounded the Sulphite not only did not reply, but her speed was increased.

14. The master of the Sulphite admits that at the time of the initiating of the port-to-port passing signal the passing could have been accomplished with safety. He admits having the Mullen under observation for fifteen minutes before the collision. When he left the Canada Steamship dock, he navigated his barge in a "cater-corner", or diagonally, from the dock on

a course which would take him beyond the middle of the channel, and he appeared to be directing his course towards the southeast pier, from which the Mullen was approaching, notwithstanding he gave the Mullen to understand that he was going to pass port to port. When he realized the situation created by his disregard of the one-whistle passing blast, he increased his speed to half speed, about 4 miles an hour, and headed on the north pier, albeit somewhat belatedly, and pulling the barge into the jaws of collision with the Mullen in the immediate and dangerous proximity off the south pier.

15. The Mullen's speed before reaching the "knuckle" on the pier was somewhat between 2½ and 3 miles an hour. From then on she stopped her engines and went into reverse and by the time the collision occurred she was nearly motionless. On the other hand, the Sulphite continued to head toward the south pier until the Mullen sounded a danger signal, and then, and not until then, did the Sulphite attempt to negotiate a port-to-port passing. It was too late. Precious moments were lost by the Sulphite's failure to embark on a port-to-port passage immediately after their exchange of the first signals. She increased her speed sufficiently to pass in front of the Mullen from starboard to port and attempted to pull the barge across the Mullen's bow as well, and thus setting the scene for the collision. Following the one-blast exchange, the Sulphite continued her course in about the middle of the channel and somewhat west of the channel range, when she had a navigable channel of at least 175 feet wide to her starboard and ample time to direct her course, if only slightly, to her starboard and avoid a collision.

## Conclusions of Law.

■ 1. The Sulphite's assent to a port-to-port passing placed on her the responsibility to direct her course to starboard sufficiently to enable the vessels to negotiate the passing with safety to both. The navigable channel was sufficiently wide for both vessels to pass each other port to port, with care and circumspection.

■ 2. The Sulphite's master attempted to justify his maneuver by relying on a custom requiring a downbound vessel coming from the lock to wait at the lock until the upbound vessel about to enter the locks ties up at the south pier. However, in this instance, the vessels exchanged one-blast signals for a port-to-port passing when a sufficient distance away from each other for a safe passing; hence the custom cannot be invoked in this situation since the Mullen was given to understand, by Sulphite's agreement to a port-to-port passing, that the custom would not be relied upon. Furthermore, the flotilla was at the Canadian docks when first observed by the Mullen, as she was emerging from the lock, and a considerable distance beyond the end of the south pier, so that the Mullen was justified in sounding a one blast of her whistle to learn of the Sulphite's intentions. This custom applies only when the vessel going into the lock puts a man with a line on the pier.

■ 3. Reasonable prudence based on his nautical experience and his skill as a mariner required the Sulphite's master, after agreeing to a port-to-port passing, to direct his course as near to the east bank of the channel as he could with safety. Had he done this, a collision would have been avoided. He failed to carry out his undertaking and to keep out of the way of the Mullen; in that, he is guilty of extremely poor seamanship and the violation of the rules of navigation applicable to the situation presented here. Rule 22, Canadian Rules of the Road for the Great Lakes.

■ 4. The "special circumstances rule" cannot be invoked to excuse the faulty navigation of the Sulphite. Her master created the dangerous situation by his reckless disregard of the passing arrangement previously agreed upon, without indicating to the Mullen by any signal that he did not consider himself bound by the one-whistle passing agreement. He cannot, therefore, under these conditions, use the "special circumstances rule" to excuse his own dereliction. A master of a vessel cannot be heard to say at one and the same time that while he agreed upon a passing signal he did not intend to be governed by it in the navigation of his vessel. In doing this, the master of the Sulphite was guilty of a glaring fault in her navigation.

5. The Mullen was not guilty of any navigation fault. She had a right to rely on the Sulphite's agreement that she would keep to her own side of the channel range, and that she would stay out of the Mullen's way. Lake Erie Transportation Co. v. Gilchrist Transp. Co., 6 Cir., 142 F. 89. The Mullen's master used good judgment in blowing a one-blast whistle to the Sulphite when the vessels were approximately 2500 feet apart. It was good seamanship on his part to stop the engines of his vessel, reverse and put his engines full speed astern. Had the master of the Sulphite used equal good judgment by carrying out his agreement and navigated his ship prudently and with ordinary skill, the collision would have been averted. Reversal of the Mullen's engines and sounding the danger alarm was the exercise by her master of good judgment and caution at a time when the situation in front of him appeared dangerous and when he realized that a collision was probable. Had he done anything less than that, he would have been himself guilty of a navigating fault. He was in effect "in extremis" and used his best judgment in a bad situation that was not of his making.

6. The navigation of the Mullen was proper under the conditions existing at the time. The proximate cause of the collision was the failure of the Sulphite's master to adhere to the one-blast agreement and passing port to port; that, having ample opportunity to avoid the collision and without any further notice or signal to the Mullen and in disregard to the established port-to-port passage he directed the course of his ship towards the south pier and did not change his course to conform to the exchanged passage signals until too late to execute the maneuver. His nonconformance to the agreed upon port-to-port passage, and his faulty navigation in crossing the bow of the Mullen at close range, causing the Barge Delkote to drift into collision with the Mullen was the proximate cause of the collision.

7. Libelant will have decree for full amount of his damages and the cross-libel is dismissed.