Jerome HARRIS, Administrator of the Estate of David Bryce Stines, Deceased

and

Jerome Harris, Administrator of the Estate of George E. Allen, Jr., Deceased, Plaintiffs,

v.

UNITED STATES of America

and

Tennessee Valley Authority, Defendants.

Civ. A. No. 902.

United States District Court
W. D. Kentucky,
Paducah Division.

Aug. 7, 1957.

Chas. A. Williams, Ernest W. Rivers, Williams, Rivers & Melton, Paducah, Ky., for plaintiffs.

J. Leonard Walker, U. S. Atty., Charles M. Allen, Asst. U. S. Atty., Louisville, Ky., for defendant United States.

Joseph C. Swidler, General Counsel, Tennessee Valley Authority, Charles J. McCarthy, Solicitor, Tennessee Valley Authority, Knoxville, Tenn., John C. Lovett, Benton, Ky., R. Lynn Seeber, Tennessee Valley Authority, Knoxville, Tenn., for defendant Tennessee Valley Authority.

SHELBOURNE, Chief Judge.

This action was instituted September 7, 1956, by the administrator of the estates of David Bryce Stines and George E. Allen, Jr., against the United States of America and the Tennessee Valley Authority to recover for the estate of Stines the sum of $188,506.84, and for the estate of Allen the sum of $194,761.25. The complaint is separated into three major divisions, styled Count I, Count II, and Count III.

Count I alleges jurisdiction under Sections 1331 and 1349, Title 28, United States Code. It is alleged that on or about September 10, 1955, the Tennessee Valley Authority was operating and in exclusive control of the Kentucky Dam on the Tennessee River, approximately two miles from Gilbertsville in the State of Kentucky; that the decedents Stines and Allen on said date were riding in a boat on the Tennessee River near the dam on what is known as Kentucky Lake when the defendant Tennessee Valley Authority carelessly and negligently permitted a section or gate of said dam to be opened, thereby causing a hazardous and dangerous condition upon the waters of the lake imperiling persons in boats on the lake; that the alleged opening of the section or gate was without adequate or any warning to persons traveling upon the waters and without reasonable or any provision for their protection or warning.

Count II of the complaint alleges jurisdiction under the Federal Tort Claims Act (Section 1346(b), 28 U.S.C.A.). It is alleged that on September 10, 1955, the United States of America, by and through the U. S. Corps of Engineers and/or the U. S. Coast Guard acting through their agents, was in control of the Tennessee River and Kentucky Lake, formed by the Kentucky Dam across the Tennessee River, and was responsible for giving reasonable and adequate warning to persons using the river and the lake of the danger existing in and around the dam by reason of the construction and operation thereof by the Tennessee Valley Authority.

In both Count I and Count II it was alleged that Stines and Allen were drowned while riding upon the lake in a boat which was caused to capsize and sink by reason of the failure of the Tennessee Valley Authority, the U. S. Coast Guard, and the U. S. Corps of Engineers to give reasonable and adequate warning of the dangerous condition of the water at said time and place.

Count III of the complaint adopts all of the allegations of Counts I and II, and alleges that the decedents suffered death as the direct and proximate result of the joint and concurrent negligence of the defendants.

The Tennessee Valley Authority, by its answer, admitted its operation and exclusive control of Kentucky Dam, except for the lock portion thereof which it states was being operated on September 10, 1955, by the Department of the Army. The Authority denied that it had any control whatsoever over navigation on the Tennessee River or Kentucky Lake or any lawful right to prevent Stines and Allen from operating a boat on Kentucky Lake at the time and place at which the drownings occurred. The Authority alleged affirmatively that the decedents were guilty of negligence, which was either the sole or proximate contributing cause of their deaths. It further alleged that the decedents had assumed the risk of the accident which caused their deaths by entering into dangerous waters in an unsafe boat with

full knowledge of the danger of existing conditions.

The United States, by its answer as amended, admitted the drowning of the decedents, but denied that it had any duty to give reasonable or adequate warning of the alleged dangerous condition of the waters of Kentucky Lake, and denied that the United States had any control of the waters of the lake where the drownings occurred. It also alleged negligence on the part of the decedents, which either caused or contributed to their drowning, and also affirmatively pleaded that decedents had assumed the risk of conditions which resulted in their deaths by entering into dangerous waters in an unsafe boat with full knowledge and complete disregard of the known danger and warnings of danger.

The case was tried to the Court without a jury on June 13 and 14, 1957. It was submitted to the Court on a stipulation, answers to interrogatories, and requests for admissions read into the record at the time of the trial, the testimony orally heard in Court, and depositions, from which the Court makes the following findings of fact.

Findings of Fact

1. Kentucky Dam across the Tennessee River near Gilbertsville, Kentucky, is approximately one and one-half miles long. The lake, known generally as Kentucky Lake, is approximately two miles wide. The lake extends southwardly through a portion of Kentucky, through the State of Tennessee and well into the State of Alabama, a total length of 184 miles. The Tennessee River north of the dam is approximately 1,500 feet in width. At the eastern terminus of the dam there are located the navigation locks; then a section described in the evidence as the switchyard section; next, going westwardly, the turbine intake section, immediately west of which is the spillway section and then the earth fill section. The dam is traversed by the tracks of the Illinois Central Railroad, supported by piers built into the dam, and also by a highway bridge cantilevered from the railroad piers.

The turbine intake section of the dam (immediately south of which the drownings here involved occurred) consists of openings through which water flows into five generators, numbered 1, 2, 3, 4, and 5 from east to west. This intake section is east of the original main channel of the Tennessee River. Each turbine intake consists of three slots, each slot being 16½ feet wide and 44½ feet high. When the lake elevation is at 355.6 m.s.l., the top of each slot is 28 feet below the surface of the lake, and the bottom of each slot is 72 feet below the surface of the waters. The slots are protected by screens or racks, preventing timbers and debris entering the turbines. The screens are protected by a skimmer wall which extends down into the water to a point 15½ feet above the top of the screen.

2. September 10, 1955, the date of the fatal accident, units 1, 2, 3, and 4 of the turbine intakes were operating at substantially full load; unit 5 was not in operation; the spillway gates were closed, and this condition existed unchanged from approximately 5 o'clock A.M., until immediately after the drownings when unit 4 was shut off. The drownings occurred immediately south of turbine intake No. 4. Water in the reservoir stood at an elevation of 355.6 m.s.l.

3. Coakley's Village Dock is situated in an embayment on the west side of the lake and south of the dam. The decedent Allen owned the boat in which he and Stines were riding when the accident occurred, and for some two months prior to the date of the accident the boat had been kept at Coakley's Dock. The boat was a wooden structure, flat bottomed, with pointed bow and square stern, 12 feet long with 14-inch sides, and was from 40 to 48 inches wide. There was attached to the boat a 3-horsepower outboard motor, owned by the decedent Stines, which for some time had been left attached to the boat at the dock.

Stines and Allen had with them in the motorboat two fishing tackle boxes, their rods and reels, a plastic Coca-Cola holder or container, and a gasoline can; Stines' weight was approximated at 158 pounds and that of Allen at 175 pounds. Neither of them wore a life jacket or preserver and the boat was not equipped or furnished with life preservers.

4. The preponderance of evidence is that on the occasion in question a string of buoys was extended across a portion of Kentucky Lake, beginning at a parking area on the earth fill section west of the spillways and extending eastwardly to the upper or south end of the floating guide wall on the navigation locks. The string was comprised of from eight to ten buoys, each having four signs reading "Danger" affixed to the conical top of the buoy. These buoys, property of the Tennessee Valley Authority, were installed and maintained by the U. S. Coast Guard, under an agreement with the Tennessee Valley Authority, for the purpose of warning of the dangers of entering the area of the lake south of the spillway gates and the turbine intakes.

5. About 2 o'clock P.M., on the date of the accident, Stines and Allen got into Allen's boat at Coakley's Dock and proceeded directly from the dock to the dam. The day was clear but a strong wind made the waters of the lake turbulent and whitecaps were on the waves.

The men were first observed near turbine unit No. 1, where they had their boat tied to a "pulley eye" in one of the piers. They fished along the south side of the dam toward the No. 4 turbine intake. They were drowned in the No. 4 intake area, and when first observed in that area their boat was partially filled with water and was in a whirlpool, described by the witness Koebel as being 12 feet in diameter, in which the boat was whirling about.

It was testified by the witness Elder that, on March 29, 1957, he conducted tests at the site of the drownings with conditions as they existed on the day of the drownings duplicated with respect

to the elevation of the lake and the condition of the openings of the spillways and the turbine intakes, except as to the wind, waves, and whitecaps. Elder testified that the whirlpool, as it was described by Koebel, was in fact more of a surface eddy caused by the flow of water around one of the railroad piers and that it did not have the downward pull at the vortex as would a whirlpool.

The witness Koebel and the witness Warren were fishing from the top of what is described as a "catwalk" or inspection bridge. Warren's attention to any danger was attracted by cries for help. Koebel and Warren attempted to render assistance with their fishing lines but were unsuccessful. Warren was sent to the lock master's office, from which a telephone call was placed to the operator of the powerhouse and the flow of water into No. 4 turbine intake was immediately shut off, but in the meantime Stines and Allen had drowned.

Mr. Coakley was summoned from his boat dock and immediately came to the scene of the accident in a large cruiser.

After the water was shut off in No. 4 turbine intake, Allen's boat reappeared on the surface with its outboard motor missing from the stern to which it had been attached.

6. Elder testified that, on March 29, 1957, with conditions as they existed on the date of the accident duplicated, the eddy was visible to a man in a small boat from a distance of at least 50 feet.

7. Coakley testified that when he approached the scene from his dock immediately following the accident the buoys and the signs thereon were plainly visible.

8. Thomas B. McCowan, a foreman at Union Carbide Company under whose supervision both Stines and Allen worked, testified that a few weeks prior to accident he had a conversation with Allen, when the latter was telling him about fishing in the vicinity of the dam, and he explained to Allen the way the turbines operated in the dam and warned him of the danger incident to fishing in the vicinity of the dam.

9. George E. Allen, Jr., was 28 years of age and at the time of his death had an expectancy of life, according to the life tables, of 43.04 years; David Bryce Stines was 31 years of age and had a life expectancy of 39.06 years.

At the time of their deaths, Allen and Stines were in the employ of Union Carbide Company at its plant near Paducah, Kentucky; both had responsible jobs, which they had reached through training and experience, and each was earning from $95 to $100 per week.

It was stipulated and agreed that the funeral expenses for Allen were $811.25, and $976.84 for Stines.

Each had served in the U. S. Navy and Allen had had sea duty.

### Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of this case. Title 16 U.S.C.A. § 831c and Title 28 U.S.C. § 1346(b).

2. Section 2680(*l*) of Title 28 U. S. Code exempts from the provisions of the Tort Claims Act claims against the United States arising from the activities of the Tennessee Valley Authority. Since the plaintiffs' claims against the United States are based upon alleged negligence on the part of the U. S. Engineers and members of the U. S. Coast Guard, these claims must fail for the reason that both the construction of Kentucky Dam and its operation constitute activities of the Tennessee Valley Authority.

In addition, there is no negligence that could be imputed to the U. S. Engineers in charge of the locks, and the Coast Guard was acting in conjunction with the Tennessee Valley Authority in placing and maintaining the line of buoys delineating the danger zone south of the dam. See United States ex rel. and for use of Tennessee Valley Authority v. Lacy, D.C.Ala., 116 F.Supp. 15; Dalehite v. United States, 346 U.S. 15(28), 73 S.Ct. 956, 97 L.Ed. 1427.

3. Two questions must be answered in connection with the plaintiffs' claims against the Tennessee Valley Authority:

First, was there negligence on the part of the Tennessee Valley Authority in failing to have a sign or signs, other than buoys, on the south side of the dam?

Second, were Stines and Allen guilty of contributory negligence, or did they assume the risk of fishing in the waters of the lake immediately adjacent to the dam?

The answer to the first question is not free from difficulty. In the light of the holding of the United States Circuit Court of Appeals for the Sixth Circuit in the case of Dye v. United States, 210 F.2d 123, plaintiffs' counsel insist that they are entitled to recover.

The crux of the Dye case seems to be that Robert D. Cole, an employee of the U. S. Engineers, violated his instructions to keep a lookout upstream for boats approaching the dam while the wickets were open and failed to look out over the river for some 30 minutes after reporting for work, and when he did look he saw the boats going over the dam. It was not disclosed in the evidence in the Dye case that plaintiffs' decedents knew of the construction of the dam or the danger incident to boating on the river above the dam when the wickets were open. Their conduct indicated complete ignorance of the danger incident to boating on the river in the vicinity of the dam when the wickets were open, if not ignorance of the actual existence of the dam. It is to be noted in the Dye case that the dam extended above the surface of the water only about 1½ feet.

In the instant case, both Stines and Allen are shown by the evidence to have fished where their drowning occurred on several occasions prior to the fatal accident. Kentucky Dam extends high above the surface of the lake lying south of it and its presence could not be overlooked or its purpose misinterpreted. It is not an unreasonable inference that men of Stines' and Allen's intelligence and experience on the lake could not be unaware that at times waters of the lake would be projected through the dam and that, in the generation of electricity

at the dam, water power was utilized by means of openings in the dam. No notice or warning was necessary to acquaint the decedents with the presence of the dam or its purpose and function. There is no duty to warn of a condition that is obvious. Empire District Electric Co. v. Rupert, 8 Cir., 199 F.2d 941, certiorari denied, 345 U.S. 909, 73 S.Ct. 649, 97 L.Ed. 1344.

In considering the second question relative to contributory negligence, Section 526a of Title 46 U.S.C.A. classifies motorboats into four classes, and the motorboat of Allen falls into Class A of that section. A motorboat is defined in Section 526 as including every vessel propelled by machinery and not more than 65 feet in length, except tugboats and towboats propelled by steam; Class A includes motorboats less than 16 feet in length. Section 526e provides that such boats shall carry at least one life preserver, or life belt, or ring buoy, or other device of the sort prescribed by the regulations of the Commandant of the Coast Guard for each person on the boat, so placed as to be readily accessible. This provision of law was disregarded by plaintiffs' decedents on the day of the accident.

It was testified by Charles Lindsay that he and Stines, in the late spring of 1955 and one time in June, 1955, fished in the recesses above the dam where the turbine intakes are located, and that the last time (June, 1955) he and Stines started out from Coakley's Dock in Allen's boat, a wave came over the side of the boat, and they turned back to Coakley's Dock and rented a metal boat.

In the case of Empire Electric Co. v. Rupert, supra, the plaintiff was riding in a small wooden fishing boat and was swept over the spillway of the dam. Despite his lack of knowledge of the spillway in the dam, it was held, under the law of the State of Missouri, that a failure to see what was plainly visible was contributory negligence. The same law prevails in Kentucky. Kentucky Bus Lines v. Wilson, Ky., 258 S.W.2d 486, 488; Chesapeake & O. Ry. v. Harrell's Adm'r, 258 Ky. 650, 81 S.W.2d 10.

The duty to warn is designed for the protection of those who are unaware of danger. Durbin's Adm'r v. Nally, Ballard & Saltzman, Ky., 263 S.W.2d 102.

The Court concludes from the evidence in this case that no negligence on the part of the Tennessee Valley Authority was proven, and that both Stines and Allen were guilty of such contributory negligence in going into the whirlpool or eddy, which was plainly visible, as to preclude any recovery on the part of their respective estates.

An order, therefore, will be entered this day dismissing the complaint as to all the defendants.