JOHN I. HAY COMPANY, Libelant,

v.

The M/V DOROTHY I. SOUTHERN, her Engines, Tackle, Apparel, etc., and Caruthersville Towing Company, Respondent.

No. 4522, Division D.

United States District Court
E. D. Louisiana,
New Orleans Division.
July 22, 1963.

---

Terriberry, Rault, Carroll, Yancey & Farrell, Rufus C. Harris, Jr., Benjamin W. Yancey, New Orleans, La., for libelant.

Deutsch, Kerrigan & Stiles, Jack G. Carinhas, Jr., Cornelius G. Van Dalen, New Orleans, La., for respondent.

AINSWORTH, District Judge.

This matter involves a collision in the Gulf Intracoastal Waterway in Louisiana at Mile 200 in which libelant's towboat, CHICAGO BRIDGE, was involved with respondent's towboat, the M/V DORO-THY I. SOUTHERN. The CHICAGO BRIDGE, a steel hull boat 80 feet long and 20.75 feet wide, drawing 6 feet of water, was proceeding eastbound, without tow, and the SOUTHERN was proceeding westbound pushing, in a tandem rigid tow, four heavily loaded oil barges with a total over-all length of the flotilla of 1,060 feet.

At the point involved there is a right-hand bend of about 10° for westbound vessels. The Waterway is approximately 200 feet wide from bank to bank and was dredged for a channel of 125 feet in width by 12 feet in depth. Respondent contends that there is a 75-foot shoal at the bend extending along the north bank 100 feet east and west from the point of its greatest extension into the channel and that water depth over this shoal did not exceed 9 feet.[1] The draft of the three lead barges was 8 feet, 6 inches, and of the fourth barge of the SOUTH-ERN's flotilla 10 feet, 3 inches, said by respondent to be loaded to a draft of 8½ to 9 feet.

The accident occurred at 10:00 a. m. on March 27, 1960, under favorable weather conditions, with little or no wind or current and good visibility.

■ This was a typical narrow channel meeting situation. As the vessels approached their pilots exchanged radio conversation relative to their passage in the canal. There is a dispute as to the passage initially agreed upon, but no dispute that some time shortly before the collision a one whistle or port to port passage had been finally agreed to and proper signals exchanged. Each vessel was making moderate speed of approximately 4 miles per hour. As the SOUTHERN entered the slight bend in the Waterway, it appeared to be negotiating toward the starboard or north bank but suddenly began to sheer to port to the south bank. The CHICAGO BRIDGE at the time was holding to starboard toward the south bank but the lead barge of the SOUTHERN's flotilla continued to sheer toward the south bank and collided with the CHICAGO BRIDGE which by this time had come completely to the south bank in an attempt to evade the oncoming tow. After the collision the lead barge of the SOUTHERN's flotilla continued its course, raking the south bank for a considerable distance. The CHICAGO BRIDGE sustained considerable damage

---

1. Libelant states there is no 9-foot shoal as contended, and offered cross sections of the canal to show that the channel at this point was 158 feet wide in January 1962 for 10-foot draft vessels and 140 feet wide for 12 feet depth.

as a result of the collision,[2] but none was suffered by the SOUTHERN or its tow.

As is usual in many of these admiralty collision cases, there is a sharp conflict and dispute about what happened and who caused the accident. The CHICAGO BRIDGE contends that a port to port passage having been agreed to, both vessels were required to adhere to their agreement unless some unusual circumstances became apparent to prevent the agreed passage being carried out. The SOUTHERN contends that the CHICAGO BRIDGE was proceeding too fast under the circumstances, should have noted that the SOUTHERN's tow was swinging more slowly toward the north bank than had been anticipated, and that it should not have insisted on the port to port passing when there was available deep water for her to proceed to port and avail herself of the last clear chance to avoid the collision.

Under the circumstances, however, we find the SOUTHERN solely at fault. Having agreed to a port to port passage and exchanged whistle signals, it was required to keep to its starboard side, the north bank of the canal, and not permit its tow to sheer to port toward the south bank and into collision with the CHICAGO BRIDGE.[3] We are convinced that its steersman was not sufficiently familiar with the Gulf Intracoastal Waterway, having traversed it only a few times, did not know where the shoaling at the bend was actually situated and became confused when he saw his heavily laden tow was not negotiating toward the north bank as well as he had intended. He testified that his mistake was in agreeing to a port to port passing instead of a starboard to starboard one. Neverthe-

less he did agree and was bound to follow the agreed passage under the circumstances. His faulty navigation therefore was a violation of the statutory provision in Inland Rules, Article 18, Rule 1, as well as the general rule that vessels meeting end on shall pass port to port. Griffin on Collision, p. 71.

The SOUTHERN also violated the Narrow Channel Rule, Inland Rules, Article 25, in permitting its tow to sheer sharply to port toward the south bank and into the path of the CHICAGO BRIDGE. Pure Oil Company v. Jack Neilson, Inc., 135 F.Supp. 786 (E.D. La., 1955), affirmed 5 Cir., 1956, 233 F.2d 790.

■ Ordinarily, Article 18, Rule 1, and Article 25 of the Inland Rules providing for port to port passage apply to meeting situations in the relatively narrow Gulf Intracoastal Waterway.

We do not believe the pilot of the CHICAGO BRIDGE could have taken any more evasive action than he did by pulling hard to starboard to the south bank in an attempt to avoid being struck. He was placed in a position of emergency through the improper handling of the SOUTHERN whose lengthy flotilla fairly well blocked the channel at Mile 200. Where a master exercises his best judgment in an emergency not created or contributed to by him, as we believe the CHICAGO BRIDGE's skipper did, we believe he has discharged every obligation due the approaching SOUTHERN, and that he has not violated the General Prudential Rule or the Special Circumstances Rule (Inland Rules, Articles 27, 29). See Farwell, The Rules of the Nautical Road, p. 328; Griffin on Collision, p. 529; New York, New Haven and H.

2. The port side of the CHICAGO BRIDGE's deckhouse was indented some 29 feet from the forward corner aft to the galley door.

3. The Court has reconsidered its ruling in connection with the Report of Marine Casualty dated March 29, 1960, signed by John V. Nicely, master of the SOUTHERN. An offer of proof has been made by libelant and the Court now holds that Captain Nicely's report should be admitted in evidence. The report in at least three places refers to the sheering by the SOUTHERN and its tow and must be considered as an admission against interest. Captain Nicely explains in the report " * * * that [SOUTHERN's] tow had taken a sheer, and was not swinging fast enough, for port passing."

R. Co. v. Baltimore & Ohio R. Co., 2 Cir., 1956, 236 F.2d 228.

We are convinced that the SOUTH-ERN's steersman lost control of his lengthy tow and that the CHICAGO BRIDGE, proceeding as it was entitled to after the agreed passage, had a right to expect that it would not be struck by the SOUTHERN's tow. The SOUTH-ERN was therefore solely at fault in bringing about the collision and ensuing damage.

An interlocutory decree therefore for libelant will be entered.

