PHILTANKERS, INC., Plaintiff,

and

Crown Central Petroleum Corporation, Intervening Plaintiff,

v.

M/V DON CARLOS, her engines, tackle, apparel, etc., in rem, R/A Soya and Wallenius Lines in personam, and M/V Alvega, her engines, tackle, apparel, etc., in rem, Alkaid Shipping Co., Ltd. and Navigation and Coal Trade Co., Ltd. in personam, Defendants.

R/A SOYA and Walleniusrederierna, Defendants and Third-Party Plaintiffs,

v.

M/V ALVEGA, her engines, tackle, apparel, etc. in rem, Alkaid Shipping Co., Ltd. and Navigation and Coal Trade Co., Ltd. in personam, and United States of America, Third-Party Defendants.

Civ. A. No. H–78–1557.

United States District Court,
S. D. Texas,
Houston Division.

April 6, 1981.

Henry F. White, Jr., Hill, Betts & Nash, New York City, Robert Davee, Eastham, Watson, Dale & Forney, Houston, Tex., for defendants and third-party plaintiffs M/V Don Carlos et al.

James E. Ross, Ross, Griggs & Harrison, Houston, Tex., for defendant and third-party defendant M/V Alvega et al.

Allen Van Emmerik, Trial Atty., Torts Branch, Civil Division, Dept. of Justice, Washington, D. C., Robert Darden, Asst. U. S. Atty., Houston, Tex., for third-party defendant United States of America.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

SEALS, District Judge.

This cause of action arose and was brought under the admiralty jurisdiction of the United States as a result of a collision in the Houston Ship Channel between the inbound car carrier M/V DON CARLOS and the tanker S/S PHILLIPS TEXAS which was, at the time of the collision, moored at the Crown Central Petroleum Corporation dock. Immediately prior to this collision, the M/V DON CARLOS had met and passed the outbound tanker M/V ALVEGA in a routine port to port passing, following which the DON CAROLOS took an uncontrolled sheer off the starboard or north bank, crossed over the center line of the channel, and struck the moored PHILLIPS TEXAS causing damage to both vessels and the dock facility. Damages were stipulated and a court trial was held to determine liability. This action was filed by the owners of the S/S PHILLIPS TEXAS and the owners of the dock intervened. The owners of the M/V DON CARLOS settled their claims, and then proceeded on their Third Party Complaints. At the time of trial, the M/V DON CARLOS and those at interest therewith were thus cast in the role of Plaintiff, and the M/V ALVEGA and her owners and the United States of America, in the role of Defendants. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court hereby makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. The S/S PHILLIPS TEXAS is a steel tank ship of Liberian registry, owned and operated by Philtankers, Inc. The PHILLIPS TEXAS was built in 1961, and is 224.52 meters in length and 30.61 meters in breadth with a dead weight tonnage of 28,805 DWT. At the time of the incident made the basis of this action, the PHIL-

LIPS TEXAS was properly moored starboard-side-to the Crown Central Petroleum dock on the south side of the Houston Ship Channel, which dock is owned and operated by Crown Central Petroleum Corporation (Crown Central).

2. The M/V DON CARLOS is a steel motor ship of Swedish registry, owned by R/A SOYA and operated by Wallenius Lines, both Swedish companies. The vessel was built in Sweden in 1976, and was designed and constructed for the transportation of automobiles and similar cargo. The DON CARLOS is what is known as a "pure car carrier", being designed and constructed solely for the purpose of transporting such cargo, and is 202.62 meters in length and 28.15 meters in breadth, with a dead weight tonnage of 14,479 DWT. By virtue of its inherent design, the DON CARLOS has an extremely high freeboard of approximately 25 feet, and as a result is extremely susceptible to the effects of wind, particularly in areas of restricted maneuverability such as the Houston Ship Channel. At the time of the incident made the basis of this action, the DON CARLOS was inbound for City Dock 26 with a Houston pilot on board, but without the assistance of tugs.

3. The M/V ALVEGA is a steel motor tank ship of British registry, owned by Alkaid Shipping Co., Ltd. and operated by Navigation and Coal Trade Co., Ltd. The ALVEGA was built in 1977 and is 210.01 meters in length, 32.29 meters in breadth and has a dead weight tonnage of 33,329 DWT. At the time of the incident made the basis of this action, the ALVEGA was outbound from the ARCO "B" terminal on the starboard (south) side of the channel, and had just effectuated an agreed port-to-port passing of the DON CARLOS at a point just below or past the Crown Central dock facility.

4. On the day of the incident, after passing the outbound ALVEGA, the DON CARLOS experienced a sheer off the north bank of the channel at what is known as the Crown Central bend and proceeded across the center of the channel striking the PHILLIPS TEXAS which was properly moored on the south side of the channel at the Crown Central dock.

5. Thereafter, suit was instituted by Philtankers, Inc. against the DON CARLOS in rem and against R/A Soya and Wallenius Lines in personam. Plaintiff Crown Central subsequently intervened against these Defendants. R/A Soya and Wallenius Lines then filed Third-Party Complaints against the M/V ALVEGA in rem, and against Alkaid Shipping Co., Ltd. (Alkaid) and Navigation and Coal Trade Co., Ltd. (Navigation) in personam, the ALVEGA's owner and operator, respectively, and against the United States of America, for the alleged negligence of the United States Army Corps of Engineers in failing to properly dredge the channel at the Crown Central bend or to warn of the shoaling which had occurred on the north bank of the channel at that location. Plaintiff Philtankers, Inc. and the Intervening Plaintiff Crown Central subsequently amended their complaints to include the M/V ALVEGA in rem and Alkaid and Navigation in personam.

6. Defendants R/A Soya and Wallenius Lines then settled the claims of Philtankers and Crown Central and at the time of trial sought indemnification and/or contribution for damages from the M/V ALVEGA, Alkaid, Navigation and the United States, for damages sustained by the DON CARLOS, the PHILLIPS TEXAS, and Crown Central. The quantum of such damages was stipulated by the parties, and the trial was limited solely to the issue of liability.

7. On the evening of August 13, 1981, the DON CARLOS was inbound enroute to City Dock 26 in the Port of Houston. At that time, Captain Michael Lawson, a licensed Houston pilot, boarded the vessel at the Galveston Sea Buoy pursuant to regulations and commenced the inbound transit into the Houston Ship Channel. Aware that the DON CARLOS was a large, unwieldy vessel, and that because of the existing 15–20 knot southerly winds and the DON CARLOS' high freeboard, maneuvering through the upper reaches of the ship channel would be dangerous without proper assistance, Pilot Lawson requested by radio

that two tugs meet him above Greens Bayou to assist the DON CARLOS in maneuvering through the channel.

8. Without waiting for confirmation that tug assistance would be available as requested, and with the knowledge that it would be necessary to maintain a relatively high rate of speed in order to maintain steerageway in the channel without tugs, Captain Lawson and the DON CARLOS proceeded into the channel, further stating to the Coast Guard Vessel Traffic Control System (VTS) that he would prefer not to meet any deep draft outbound sailings above Greens Bayou.

9. Thereafter, Captain Jack Vetter, another licensed Houston pilot, boarded the M/V ALVEGA at the ARCO "B" dock in preparation for that vessel's getting underway for sea. Upon boarding the vessel, and after preliminary discussions with the master of the ALVEGA, Captain Vetter notified VTS at 1906 of his planned departure from the ARCO "B" dock. VTS immediately informed Captain Vetter of the inbound DON CARLOS' position and that the DON CARLOS had requested not to meet any outbound vessels above Greens Bayou. Despite the request and knowing that this would call for him to keep his vessel at the dock for one and one-half hours, Captain Vetter informed VTS at 1907 that the ALVEGA had taken in all lines and was proceeding. Captain Vetter then contacted Captain Lawson aboard the DON CARLOS by radio and the two pilots agreed that ALVEGA would proceed outbound and that the two vessels would meet at the Hess Terminal Turning Basin, a wide area of the channel between the ALVEGA's position at the ARCO "B" dock and the DON CAR-LOS' then current position. Approximately ten minutes later, at 1919, Lawson called Vetter informing him of his position in the channel to which Vetter responded that the ALVEGA was now outbound.

10. Following the agreement between the two vessels to meet at Hess, the ALVE-GA got underway and proceeded outbound in the channel making the fastest safe speed possible. The DON CARLOS, unable to slow to acceptable speeds because of the effect of the winds and the necessity to proceed at a faster than normal speed in order to maintain steerageway, proceeded inbound at an immoderate rate of speed, causing it to make much faster progress up the channel than anticipated by the pilot of the ALVEGA. Captain Lawson, aware that his vessel was traveling too fast, and that he would most likely arrive at the Hess Terminal well before the ALVEGA, nevertheless took no action to slow or stop his vessel. He proceeded as slowly as possible, but this was not slow enough. The facts show that he could have heaved-to or stopped and anchored his vessel at any of several locations prior to arrival at the Hess Terminal, but chose not to do so.

11. Captain Lawson also refused tug assistance from the M/V LAURA HADEN as his vessel was approaching Lynchberg, well below the Hess Terminal. Although Captain Lawson stated that the LAURA HA-DEN was underpowered and would not have been able to control his vessel by itself, the Court finds that had Captain Lawson taken the LAURA HADEN, he would have been able to maintain steerageway and still slow his vessel sufficiently to have arrived at the Hess Basin contemporaneously or nearly so with the outbound ALVEGA, and that he had a clear duty to do so considering the dangers of proceeding on ahead through the narrow reaches of the channel with such an unwieldy vessel. Instead, the DON CARLOS proceeded ahead at its already established immoderate rate of speed, unable to stop, slow or otherwise maneuver, and without the aid of tug assistance.

12. At this point, Captain Lawson was aware or should have been aware, that the DON CARLOS would reach Hess before the ALVEGA, and that the two vessels would most likely meet at a disadvantageous, narrow reach of the channel above Hess just past the GATX Pasadena docks. Nevertheless, from this point on Captain Lawson took no steps to stop or slow and await tug assistance, but rather proceeded on ahead, apparently hoping that no emergency would

arise that would require him to slow or maneuver his vessel and knowing that he could not do so without tug assistance.

13. Upon approaching Hess Basin and seeing the ALVEGA just above the Crown Central dock, Captain Lawson announced to ALVEGA by radio for the first time that he could neither stop nor slow his vessel to await the ALVEGA and effectuate the agreed meeting. In response, and upon realizing for the first time that the two vessels would meet at the narrow stretch of the channel above Hess, Captain Vetter aboard ALVEGA took the only action he could take by agreeing with DON CARLOS over the radio, and with the appropriate exchange of one blast whistle signals, to a port-to-port passing in the narrow straightaway above Hess.

14. Thereafter, after passing the Crown Central dock and to insure that the unmaneuverable DON CARLOS would have the maximum amount of room during the agreed passing, the ALVEGA pulled well over to the starboard (south) side of the channel, rested against the south bank, and stopped her engines to eliminate any wheel wash turbulence as the DON CARLOS passed by.

15. As the DON CARLOS exited the Hess Basin, realizing that he was going to meet the ALVEGA in the narrow stretch of the channel, Captain Lawson again did nothing. Captain Lawson testified that the DON CARLOS could have taken this last opportunity to stop, drop anchor and await tug assistance before attempting to meet ALVEGA in this narrow reach of the channel or negotiate the Crown Central bend, but did not do so because it would have been inconvenient.

16. It is common knowledge among pilots in the Houston Ship Channel that the north bank of Crown Central bend is susceptible to shoaling. Common practice among the pilots when no other vessels were present was for inbound ships to cross over to the port or south side of the navigable channel into deeper water when negotiating the bend in order to minimize the sheer effect created by the shoaling on the north bank.

17. On the occasion in question, Captain Lawson was aware that his vessel would be required to negotiate the Crown Central bend on the north side because of the agreed meeting with ALVEGA who was on the south side just below the bend past the Crown Central Docks. He was also aware, as were all Houston pilots, that it would be necessary to compensate for the predicted sheer effect by placing his rudder to starboard and increasing the speed on his engines sufficiently in advance of the bend to overcome that effect and keep his vessel on the starboard side of the channel.

18. Despite this knowledge of the condition at Crown Central bend, just after the two vessels had passed, the DON CARLOS began to veer across the channel toward the moored PHILLIPS TEXAS. Captain Lawson attempted to break the sheer by increasing his rudder angle and by increasing his speed to full ahead at the last minute, but was unable to control the vessel as it proceeded across the channel striking the PHILLIPS TEXAS, causing extensive damage to both vessels as well as the Crown Central dock facility.

19. The DON CARLOS also attempts to pass the blame for this collision to the United States, contending that her sheer was caused by a shoal in the Houston Ship Channel of which the United States should have known and issued proper warnings in its monthly reports. Nevertheless, it is common knowledge among Houston pilots that the Houston Ship Channel shoals naturally between dredging, in varying degrees along its length. The reach here in question is relatively stable. The channel is surveyed from time to time by the Corps of Engineers to determine its condition, for maintenance dredging purposes. The results of such surveys are published monthly in a Hydrographic Report. The August, 1978, Hydrographic Report showed 38 foot depth in the reach here in question, in its right outside quarter. This means that the controlling (leased) depth along the entire length of that reach is an average of 38 feet across the 75 foot strip bordering the north

edge of the channel bottom. This information was conveyed to the Houston pilots, and was correct as shown by surveys taken both before and after this incident.

20. In an attempt to impeach the Corps of Engineers' surveys, the DON CARLOS relies upon a survey made for it by Brown & Root shortly after the casualty. This survey shows shoaling at the point on the Crown Central Bend where the DON CARLOS' sheer began, about 26 feet below mean low water. However, this survey cannot be credited as accurate for several reasons: (a) The accuracy of the January, 1979, Corps of Engineers' survey was not questioned at the time of trial and the Brown & Root survey is inconsistent with the results of that survey; (b) while Brown & Root's horizontal survey control was impeccable, its vertical control was not. The Brown & Root survey technician could not vouch for his depth-finding techniques, and his sounding boat did not follow the station transects dictated by the horizontal control. A finding of a depth of 26 feet at the bend is therefore highly inaccurate and cannot be relied upon; and (c) furthermore, according to the unimpeached testimony of Dr. Edward Gates, the United States' expert hydrodynamicist, the DON CARLOS' sheer was hydrodynamically inconsistent with channel conditions as shown by Brown & Root, but consistent with the conditions shown on the 1979 corps' survey.

21. Likewise, the corps' August, 1978, Hydrographic Report, which was correctly based upon previous corps' surveys, reported the channel depth in the pertinent area to be 38 feet. Even if this report is not correct, any inaccuracy cannot be a cause of the DON CARLOS' collision with the PHILLIPS TEXAS since Captain Lawson did not rely on the Report, believing for his own reasons that there was, in fact, less water on the north bank of the straightaway than the Report stated. Nevertheless, regardless of the degree of shoaling actually present, there was more than ample depth to allow the DON CARLOS to safely navigate the northern side of the channel. The fact that some shoaling was present was well known to Captain Lawson and could have been compensated for adequately if Captain Lawson had anticipated the problem earlier and made earlier and more efficient use of his engines and rudder.

22. Likewise, the Court finds that if the DON CARLOS had anchored and waited for tug assistance before negotiating the Crown Central Bend, the vessel would have been able to maintain steerageway at a much slower speed, thus reducing the sheer effect and avoiding the subsequent collision with the PHILLIPS TEXAS. However, the excessive rate of speed which the DON CARLOS was required to make in order to maintain steerageway without tug assistance, coupled with Captain Lawson's failure to make proper and prudent use of his engines and rudder to anticipate the bank sheer effect off the north bank, combined to cause the DON CARLOS to veer across the channel and collide with the PHILLIPS TEXAS.

23. The ALVEGA was not negligent in any respect and the vessel and those in charge of her navigation complied fully with all statutory and legal duties at all material times.

24. The United States of America and the U. S. Army Corps of Engineers were not negligent in any respect and complied fully with all statutory and legal duties at all material times.

25. At all times material hereto, the M/V DON CARLOS was negligent in travelling at too great a speed under the circumstances then prevailing, in proceeding up the channel without tugs to assist her, and in failing to drop her anchors and wait for tug assistance after her pilot knew or should have known he was travelling at too great a rate of speed under the conditions then existing.

26. The negligence of the M/V DON CARLOS was the sole proximate cause of the collision and resulting damages.

27. Any Finding of Fact deemed to be a Conclusion of Law is hereby adopted as such.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter of this action.

■ 2. The DON CARLOS proceeded into the upper reaches of the Houston Ship Channel at an excessive and dangerous rate of speed without tug assistance when the Pilot knew or should have known that he could neither stop, slow nor maneuver his vessel without tugs. Under the conditions of restricted maneuvering known to exist in the upper reaches of the ship channel and due to the size and admitted unmaneuverability of the vessel, the DON CARLOS had a duty to stop or slow and await tug assistance to furnish both steering and motive power in order to enable that vessel to proceed at a slower and safer rate of speed. *Rio-Orinoco-Dredge Atlas*, 249 F.Supp. 182, 1966 A.M.C. 791 (E.D.Pa.1965); *Creole Shipping, Ltd. v. Diamandis Pateres, Ltd.*, 410 F.Supp. 313, 1977 A.M.C. 189 (S.D.Ala.1976). This, she did not do, and cannot now try to shift the blame for this collision to the ALVEGA. Had the DON CARLOS obtained proper tug assistance from the one tug that was made available to her, or slowed or stopped to await additional tug assistance, this collision would not have occurred.

■ 3. Having agreed to meet the ALVEGA at the wide area at the Hess Turning Basin, the DON CARLOS was required to utilize every means at her disposal to comply with the agreement, and the ALVEGA was entitled to rely on the DON CARLOS' announced intentions. *Board of Commissioners v. The M/V FARMSUM*, 574 F.2d 289, 297 (5th Cir. 1978); *Chicago Bridge-Dorthy I. Southern*, 221 F.Supp. 538, 540, 1964 A.M.C. 1947, 1949 (E.D.La.1963); 33 U.S.C. § 210, Art. 25; *Griffin on Collision*, § 20, at 29–32 (1949). The excessive rate of speed at which the DON CARLOS was required to proceed because of its failure to obtain tug assistance, and the failure of the DON CARLOS to slow or stop and drop anchor prior to arrival at Hess when it was obvious to the pilot that his vessel would pass through Hess ahead of the ALVEGA, caused the two vessels to meet at a narrow and disadvantageous reach of the channel. The action and inaction of the DON CARLOS in this regard were in direct violation of its duty to comply with the agreed passing, and were a further cause of that vessel's subsequent collision with the PHILLIPS TEXAS. Had the two vessels met and passed at Hess, the DON CARLOS would not have been required to navigate on the north bank of the channel at Crown Central bend and could have avoided the shoaling and sheer effect altogether.

■ 4. After passing through the Hess Basin, the DON CARLOS continued at an excessive rate of speed rather than utilize the last opportunity to avoid a dangerous maneuvering situation by stopping and dropping anchor to await tug assistance. The ALVEGA had done all that she could do and had pulled well over to the starboard side of the channel and stopped her engines. The presence of the ALVEGA was a condition and not a cause of the collision. Her presence was entirely lawful and she violated no legal duty in being at that location at that time. Her presence is one of the principal conditions the DON CARLOS should have taken into account. *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979); *M/V FARMSUM, supra*, 574 F.2d at 297; *Manning v. M/V SEA ROAD*, 358 F.2d 615, 617–18 (5th Cir. 1965); *Cenac Towing Co. v. Richmond*, 265 F.2d 466, 471 (5th Cir. 1959); *Crawford v. Indian Towing Co.*, 240 F.2d 308, 311 (5th Cir. 1957); *P. Dougherty Co. v. United States*, 207 F.2d 626, 631 (3d Cir. 1953), cert. den. 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068 (1954); *The Britannia*, 34 F. 546 (D.N.Y.1888); *Chicago-Bridge, supra*.

5. This failure of the DON CARLOS to utilize the last available means to avert disaster was, of itself, sufficient to account for the subsequent collision. The DON CARLOS cannot now attempt to shift the onus of liability to the ALVEGA merely because she was there. *P. Dougherty Co., supra*, 207 F.2d at 630.

■ 6. Lastly, the fact remains that the DON CARLOS veered across the chan-

nel at the Crown Central bend and struck a properly moored vessel, the PHILLIPS TEXAS. In doing so, she violated the statutory "narrow channel" rule for inland waters, codified in 33 U.S.C., Art. 25, requiring that all vessels navigating in narrow channels keep to the starboard side.

7. Such a statutory violation creates a presumption of fault against the DON CARLOS under the rule announced in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), and in *Gele v. Chevron Oil Co.*, 574 F.2d 243, 248 (5th Cir. 1978). There is also a presumption of fault against a moving vessel which strikes a vessel lawfully moored at a dock. *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967); *Rio-Orinoco, supra*, 249 F.Supp. at 186, 1966 A.M.C. at 797. The M/V DON CARLOS has failed to rebut either of these presumptions, and indeed her own conduct is entirely sufficient to account for the casualty. It is not sufficient therefore for her to attempt to cast doubt on the ALVEGA or the United States. *P. Dougherty, supra*, 207 F.2d at 630.

■ 8. The ALVEGA was properly maneuvered at all times with due regard to the applicable statutes and regulations. After Captain Vetter boarded the ALVEGA, he checked in with the Houston Vessel Traffic Control System (VTS) in accordance with VTS Regulations. He was not negligent in getting underway from the ARCO "B" dock knowing the DON CARLOS was inbound, since he had an agreement with the pilot of the vessel to do so. The DON CARLOS attempted to shift fault to the ALVEGA for getting underway in the face of an alleged "custom" that would have called for the ALVEGA to wait at ARCO for the DON CARLOS to pass by. In the first instance, there is insufficient evidence to establish that any such custom exists, and the Court makes no findings with respect thereto. Even assuming such a custom to exist, however, the DON CARLOS agreed that ALVEGA would get underway and meet at Hess and, by doing so, indicated its intention not to be bound by any

such custom. *Pioneer Steamship Co. v. Tug SULPHITE*, 73 F.Supp. 137, 1947 A.M.C. 1677, 1682–83 (E.D.Mich.1947).

9. After getting underway, the ALVEGA communicated properly with the DON CARLOS by radio and Captain Lawson was fully aware of both the progress of the ALVEGA and the fact that his vessel was proceeding at a much faster rate than it should have been to insure the two vessels met at Hess. The fault herein is not with the ALVEGA's outbound transit at the fastest safe speed nor any alleged failure to communicate properly with the DON CARLOS, but with the DON CARLOS' proceeding inbound at an excessive and dangerous speed under the prevailing conditions, causing that vessel to arrive at the Hess Terminal ahead of ALVEGA.

■ 10. While there was some admitted shoaling at the Crown Central bend, it was not significant from the standpoint of contributing to this collision. All Houston Ship Channel pilots were aware of shoaling problems at this area of the channel and were expected to govern the actions of their vessels accordingly. Although the U. S. Army Corps of Engineers conducts periodic surveys of the depth and contours of the channel and makes that information available to persons utilizing the channel, the facts show that such surveys were properly made and properly reported in monthly Hydrographic Reports. If Pilot Lawson failed to heed the published information, the United States cannot be held accountable. The United States cannot be held liable for pilot error and has no duty to warn or provide against such want of care. *Chute v. United States*, 610 F.2d 7, 15–16 (1st Cir. 1979); *Atchison, Topeka & Santa Fe Ry. Co. v. Hamilton Bros.*, 192 F.2d 817 (8th Cir. 1951); *Reading Co. v. Pope & Talbot, Inc.*, 192 F.Supp. 663 (E.D.Pa.1961); *Jacobs v. United States*, 1979 A.M.C. 660 (E.D.Ky.1979).

■ 11. Although there is some evidence that shoaling at the Crown Central bend had progressed beyond the extent reported by the Corps of Engineers, the preponderance of the evidence is to the contrary. Nevertheless, assuming there was

some additional shoaling, the fact that it was not reported by the corps was not a cause of the collision since Pilot Lawson was aware, or should have been aware of it. Pilots are expected and required to utilize their local knowledge to evaluate their positions so as to avoid dangers independently of charts and outward appearances. *Atlee v. N.W. Union Packet Co.*, 88 U.S. (21 Wall.) 389, 396, 22 L.Ed. 619 (1875); *Burgess v. M/V Tamano*, 564 F.2d 964, 979 n.23 (1st Cir. 1977); *Kommanvittselskapet Harwi (R. Wigand) v. United States*, 467 F.2d 456, 458 n.3 (3d Cir. 1972); *Humble Oil & Rfg. Co. v. Tug Crochet*, 422 F.2d 602, 607 (5th Cir. 1970); *Matheson v. Norfolk & N.A. Steam Shipping Co.*, 73 F.2d 177, 179–180 (9th Cir. 1934); *The Miles Standish*, 1928 A.M.C. 215 (S.D.N.Y.1919); *The Somers N. Smith*, 120 F. 569, 575 (D.Me.1903); *The Hercules*, 81 F. 218, 226 (N.D.Cal.1897).

██ 12. Furthermore, ordinary mariners are required to know that "snags, deadheads, rocks, *shoals*, sunken docks and pilings . . . are common river conditions to be avoided." *Jacobs, supra*, 1979 A.M.C. at 667, and cases there cited (emphasis added). A pilot makes his daily living on his waters. Here, Pilot Lawson should have been fully aware of what lay ahead, of the wind and its effect on the ship, of shoals and bends, of the need for tugs, of the risks of passing while approaching Crown Central bend. All of these were obvious, everyday conditions with which he routinely contended. Nothing could have been more obvious and comprehensible to him, yet he failed in all respects to take sufficient action to prevent this collision.

██ 13. There is no duty to warn of the obvious. *Thibodaux v. McWayne Cast Iron Pipe Co.*, 381 F.2d 491, 495 (5th Cir. 1967); *Ninio v. Hight*, 385 F.2d 350, 352 (10th Cir. 1967); *Empire Dist. Elec. Co. v. Rupert*, 199 F.2d 941, 945, (8th Cir. 1952), cert. denied, 345 U.S. 909 (1953); *Little v. United States*, 290 F.Supp. 581, 584 (E.D. La.1968); *Hobart v. Sohio Pet Co.*, 255 F.Supp. 972, 975 (N.D.Miss.1966), aff'd 376 F.2d 1011 (5th Cir. 1967); *Harris v. United States*, 154 F.Supp. 46, 51 (W.D.Ky.1957).

Pilot Lawson, a Houston pilot, was the least likely to require a warning that if he did not take the bend at Crown Central, but instead let himself be put onto the point side by passing in the reach, the DON CARLOS would likely sheer out of control. That very event had occurred several times before. Whatever the state of shoaling, whether 38 feet, or the 30–35 feet he testified existed based upon previous sheers, or less, it was all part of the ship channel with which he worked daily, well known and obvious to him, and with which he was supposed to have been uniquely equipped to deal. He was not, as it turned out; but nothing the Corps of Engineers could have told him would have told him anything he did not know already, and would not have changed the eventual outcome.

██ 14. Regarding the accuracy of the Corps of Engineers' surveys which the DON CARLOS sought to impune at the time of trial, it is clear that both the 1978 and 1979 surveys were valid, and that they accurately depicted the depth and contours of the channel at the Crown Central bend. Based on these surveys, the shoaling condition at the bend in existence at the time of this collision in 1978 was even less than that estimated by Pilot Lawson, and no dredging by the corps would have been called for. The United States does not insure safe use of the waterways, but owes to users only the duty of ordinary due care in maintaining navigable depths. *Canadian Pacific (Bermuda) Ltd. v. United States*, 534 F.2d 1165, 1170 (5th Cir. 1976); *Guinan v. Boston, Cape Cod & N.Y. Canal Co.*, 1 F.2d 239, 244–245 (2d Cir. 1924). It can breach that duty only if it has actual or constructive knowledge of an obstruction to navigability. *Canadian Pacific, supra*, 534 F.2d at 1169; *Russell, Poling & Co. v. Conners Standard Marine Corp.*, 252 F.2d 167, 170 (2d Cir. 1958); *Ingram Barge Co. v. United States*, 432 F.Supp. 1341, 1342 (E.D.Mo.1977); *Afran Transport Co. v. United States*, 309 F.Supp. 650, 655 (S.D.N.Y.1969), aff'd 435 F.2d 213 (2d Cir. 1970), cert. denied 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971). In the present action, the United States has breached no duty and cannot be held liable.

**44**

15. As a final point, this collision was not caused by the ship channel. Regardless of the condition of the channel at the time of the collision, this condition was merely a condition, not a cause, of the sheer experienced by the DON CARLOS. *Cenac Towing, supra,* 265 F.2d at 471; *Socony-Vacuum Oil Co. v. Smith,* 179 F.2d 672, 676 (5th Cir. 1950); *The Perseverance,* 63 F.2d 788, 790 (2d Cir. 1933); *The Socony No. 19,* 29 F.2d 20, 22 (2d Cir. 1928); *Gulfcoast Transit Co. v. M/V Arctic Reefer,* 220 F.Supp. 430 (M.D.Fla.1963); *The Jemson No. 1,* 38 F.Supp. 493, 495 (E.D.N.Y.1941), *aff'd sub nom. Matton Oil Trans. Corp. v. The Greene,* 129 F.2d 618 (2d Cir. 1942); *Black Point S.S. Co. v. Reading Co.,* 14 F.Supp. 43 (D.Mass.1936), aff'd 87 F.2d 1014 (1st Cir. 1937).

16. The ALVEGA and those at interest therewith committed no negligent act and neither caused nor contributed to this collision.

17. The U. S. Corps of Engineers and the United States of America committed no negligent act and neither caused nor contributed to this collision.

18. The sole cause of this collision was the negligence of the DON CARLOS and those responsible for her navigation.

19. The Defendants are not liable to the Plaintiff.

20. Any Conclusion of Law deemed to be a Finding of Fact is hereby adopted as such.

For the reasons stated above, the Court hereby ORDERS:

JUDGMENT is awarded to the Defendants, and the Plaintiff shall take nothing from this action, and Defendants may recover their costs.